UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| LARRY SCOTT REYNOLDS, | |
| Petitioner, | Case No. 3:14-cv-01249 |
| v. | Judge Bernard A. Friedman |
| | Magistrate Judge Newbern |
| KENNETH HUTCHISON,[1] Warden, | |
| Respondent. | |

To the Honorable Bernard A. Friedman, Visiting Judge

**REPORT AND RECOMMENDATION**

On July 3, 2008, a jury convicted Petitioner Larry Scott Reynolds of first degree premeditated murder and sentenced him to life with the possibility of parole. (Doc. No. 13-6, PageID# 697.) Reynolds filed this habeas corpus petition under 28 U.S.C. § 2254 on May 27, 2014. (Doc. No. 1.) Respondent has answered the petition (Doc. No. 12) and filed the state court record (Doc. Nos. 13, 14). Respondent does not dispute that Reynolds's petition is timely and that this is his first habeas petition related to this conviction. (Doc. No. 12, PageID# 38–39.)

Reynolds argues "that a full hearing on [his] ineffective assistance of counsel claims" is warranted. (Doc. No. 1, PageID# 17.) This Court need not hold an evidentiary hearing where "the record refutes the applicant's factual allegations or otherwise precludes habeas relief." *Schriro v.*

---

[1] When Reynolds filed this petition, Gerald McAllister was the warden of Northeast Correctional. (Doc. No. 1, PageID# 1.) Kenneth Hutchison now holds that office. "The federal habeas statute straightforwardly provides that the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].'" *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004 (quoting 28 U.S.C. § 2242). Accordingly, Kenneth Hutchison has been substituted as the proper respondent in this proceeding. Fed. R. Civ. P. 25(d); *Lane v. Butler*, 133 F. Supp. 3d 888, 889 n.1 (E.D. Ky. 2015).

*Landrigan*, 550 U.S. 465, 474 (2007). The Court must consider Reynolds's claims in light of the "deferential standards prescribed by [the Antiterrorism and Effective Death Penalty Act (AEDPA)]," under which a state court's factual findings are presumed correct subject to rebuttal by clear and convincing evidence. *Id.*; 28 U.S.C. § 2254(e)(1). Having carefully considered the amended petition and respondent's answer, as well as the record of proceedings in the state courts, the Court finds that an evidentiary hearing is not required in this matter. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003). For the reasons offered below, the Magistrate Judge RECOMMENDS that the petition be DENIED.

## I.      Procedural History

Reynolds was prosecuted for the murder of Melissa Atkins, who was Reynolds's former romantic partner and the mother of his child. *State v. Reynolds*, No. M2009-00185-CCA-R3-CD, 2010 WL 5343305, at *1 (Tenn. Crim. App. May 18, 2010)  (*Reynolds I*); (Doc. No. 13-31, PageID# 3650–51). On March 5, 2008, Reynolds was indicted by the Rutherford County (Tennessee) grand jury on one count of first degree premeditated murder. (Doc. No. 13-1, PageID# 100.) After a seven-day trial, a jury found Reynolds guilty as charged and the Circuit Court of Rutherford County (the trial court) sentenced him to life in prison with the possibility of parole. (Doc. No. 13-6, PageID# 695–97.) Attorneys Joe Mason Brandon, Jr., and R. Timothy Hogan represented Reynolds at trial.[2] (Doc. No. 1, PageID# 15.)

Represented by the same counsel, Reynolds filed a motion for a new trial, which the trial court denied. (Doc. No. 13-6, PageID# 715–24.) Reynolds then appealed the judgment of the trial

---

[2]      At the post-conviction evidentiary hearing, Reynolds explained that, although he was nominally represented by both lawyers, the "decision making powers" were "all vested in Mr. Brandon," and "95 percent of [Reynolds's] conversation was with [him]." (Doc. No. 14-2, PageID# 3787:9–13.)

court, arguing that (1) his Sixth Amendment right to present a complete defense was violated when the trial court prevented him from offering testimony from and about an alternative suspect named Karla Teutsch, who had previously been declared a material and necessary witness; (2) the trial court violated his right to an impartial jury by allowing jurors to ask questions; (3) the trial court admitted inadmissible hearsay despite the objection of trial counsel; (4) the trial court erred by failing to give the jury a curative instruction after the jury witnessed members of the victim's family weeping; and (5) the evidence was insufficient to support the jury's verdict. (Doc. No. 13-29, PageID# 3523–24.) The Tennessee Court of Criminal Appeals (TCCA) affirmed the trial court on December 16. 2010. *Reynolds I*, 2010 5343305, at *1. On May 25, 2011, the Tennessee Supreme Court denied Reynolds permission to appeal. (Doc. No. 13-34, PageID# 3753.)

On February 17, 2012, Reynolds filed a petition for post-conviction relief in the Circuit Court of Rutherford County (the post-conviction trial court) raising several claims of ineffective assistance of counsel. (Doc. No. 14-1, PageID# 3759–61.) After holding an evidentiary on Reynolds's claims, the post-conviction trial court found that Reynolds was not entitled to relief. (*Id.* at PageID# 3777.) Reynolds appealed that decision arguing that his trial lawyers were constitutionally ineffective because they failed to (1) adequately prepare for his trial; (2) call as a witness Reynolds's custody lawyer, Laurie Young; and (3) file a motion for the trial judge to recuse himself. (Doc. No. 14-4, PageID# 3911–12.) The TCCA affirmed the post-conviction trial court and the Tennessee Supreme Court again denied permission for further review. *Reynolds v. State*, No. M2012-01978-CCA-R3-PC, 2013 WL 1857112, at *1 (Tenn. Crim. App. May 1, 2013) (*Reynolds II*); (Doc. No. 14-6); (Doc. No. 14-9).

Represented by attorney Andrew Hall, Reynolds filed this petition on May 27, 2014. (Doc. No. 1, PageID# 17.) Respondent has answered the petition (Doc. No. 12) and filed the state court record. (Doc. Nos. 13, 14.) Reynolds filed a reply. (Doc. No. 22.)

## II.    Statement of Facts

In ruling on Reynolds's appeal of his conviction on direct review, the TCCA provided the following summary of the evidence presented at trial:

> This case arises from the killing of Melissa Atkin, the victim, on or about December 16, 2007, for which the Defendant was indicted on a charge of first degree premeditated murder. At his trial, the following evidence was presented: The victim's mother and father, Linda and Doug Atkin, testified the victim was thirty-six at the time of her death and had only one child, a son named Lucas, whose father was the Defendant and of whom the Atkins had custody at the time of trial. At the time of her death, the victim lived in Murfreesboro, in a house that she had owned for ten years, and she worked at F2 Industries located in Smyrna. The victim and the Defendant had known each other for ten to eleven years before her death. They began dating shortly after meeting, and the Defendant soon moved in with her.
>
> The summer after their son was born, in 2001, the Defendant and the victim moved to Texas, but they moved back to Smyrna after one and a half years. When they returned, the Atkins noticed that the relationship between the victim and the Defendant had become "[v]olatile." In May of 2006, the Defendant moved out of the victim's house and moved into a rental house located just eleven houses from the Atkins's home. The Defendant would sometimes visit the Atkins, often when Lucas was at their house. Most, but not all, of these visits were "amicable."
>
> After the Defendant moved out, the victim initiated custody proceedings to formalize the custody arrangement of Lucas, and, with the financial assistance of her parents, the victim retained attorney Mitchell Shannon to assist her in this regard. Before her death, papers had been served on the Defendant, who had also retained counsel, but the custody arrangement had not been finally resolved by the trial court. The Atkins felt their relationship with the Defendant changed after the victim initiated court proceedings regarding Lucas's custody and the Defendant expressed resistance to paying child support and insisted that no one come between him and Lucas. Ultimately, the Defendant ceased communicating with the Atkins, even when he came to their house to pick up Lucas, and the Atkins felt the Defendant's appearance deteriorated.
>
> While the custody proceedings were ongoing, the victim told her father that her cell phone voicemail was full of messages from the Defendant, so he assisted her in recording them to a CD and then gave her a mini-cassette recorder to use to record

and preserve the phone messages in case they became relevant to the custody proceeding. Mr. Atkin identified the recordings, which were played for the jury. During this time, the victim worked full time, so Lucas went to daycare three days a week, and the Atkins kept him two days a week. Because she wanted to spend time with Lucas, the victim and Lucas participated in karate lessons together, and the Atkins sometimes watched these lessons. One such occasion was on Friday December 14, 2007, when the Atkins went to a karate school to watch as the victim attempted to obtain her second-degree green belt and Lucas attempted to obtain his brown belt. There, they saw the Defendant, who had come to support Lucas. The victim had originally planned to have Lucas's birthday party at the karate school on December 15, 2007, but the Defendant refused her request saying that it was his weekend with Lucas.

On December 15, 2007, Linda Atkin and the victim spent the day shopping and preparing for Lucas's postponed birthday party, eating dinner, and watching a movie at Linda Atkin's house. Before leaving her parents [sic] home on that Saturday night, the victim asked Linda Atkin to call her in the morning to make sure she was awake so she could meet her parents at church. The victim had told her parents that, after church, she would help bathe their dog and eat dinner with them. The victim also said before leaving that she intended to go to Wal–Mart before going home to purchase some items she needed for herself and for Lucas's party. She left between 8:00 and 9:00 p .m.

Linda Atkin called the victim on Sunday morning at 7:30 a.m. as they had planned, but the victim never answered the telephone. The Atkins went to church and called the victim again repeatedly upon their return home from church. At around 3:30 p.m. they drove to the victim's house where they noticed her car in the driveway and her front door locked. Linda Atkins recalled that the victim kept a key to her house hidden outside of her house. When the Atkins looked through the front window, they saw that the curtains to the sliding glass doors in the back were blowing. They went around back and entered the house, where they found the victim dead, lying on her stomach, naked from the waist down, with her hands tied behind her back. Doug Atkins called 911 and, when police arrived, they asked the Atkins to wait outside, which they did, staying in the victim's driveway or in the neighboring house of Bobby Spicer.

The victim's brother, Kenneth Atkin, described his relationship with the Defendant as "pretty good" when the Defendant and the victim were dating, with their only issue being that the Defendant did not financially assist the victim in caring for Lucas. Kenneth spoke with the victim the night before her death on the telephone at 10:43 p.m. for about five to ten minutes while the victim was shopping at Wal–Mart. Kenneth heard of the victim's death the next day and went to the victim's house where he met his mother and father. He stayed outside the house for much of the time and then went into Bobby Spicer's house. The Defendant did not come to the victim's memorial service, but the Defendant's father did attend.

Christopher Atkin, Kenneth Atkin's son and the victim Atkin's nephew, testified that he visited the victim and the Defendant when they lived together in Texas. He said the two "[a]rgued a lot when they lived in Texas," recalling that one time the two were arguing so heatedly while in a car together that they had to pull over onto the side of the road.

Marcia Kautz testified she had known the victim since 1989, and she met the Defendant shortly after the victim and the Defendant began dating in 1995 or early 1996. Kautz noted the victim and the Defendant's "very passionate ... physical chemistry" but said there seemed to be some underlying tensions regarding their different social, family, and moral upbringing. Kautz, who spoke with the victim every day, last spoke to her at 9:00 p.m. on December 15, 2007, when the victim was on her way to Wal–Mart to buy a few items for Lucas's upcoming birthday party. Kautz agreed on cross-examination that she never saw any marks on the victim, or any pictures of any marks on the victim, from injuries caused by the Defendant.

Todd and Tina Burfield testified that they knew the victim and Kenneth Atkin and had met the Defendant once previously. Todd saw the victim December 15, 2007, while she was shopping at Wal–Mart and talking on her cell phone to her brother. Todd briefly took the victim's phone and spoke with Ken because the two were friends. The victim told Todd she was going to go home to clean her house after leaving Wal–Mart. Todd recalled that his Wal–Mart receipt indicated that he checked out of Wal–Mart at 10:47 p.m. Tina, Todd's wife, confirmed that he was at home when she arrived there at 11:30 p.m., and he remained home the rest of the evening. The State also introduced Wal–Mart security recordings from December 15, 2007, which showed the victim arriving in the Wal–Mart parking lot at 8:50 p.m., coming into the store at 8:52 p.m., and exiting at 11:30 p.m. After exiting, the victim went straight to her car, put her purchases in her car, and left the parking lot.

Dee Rubo, who knew the victim and the Defendant from the karate studio where her child also participated in karate classes, testified she was at the studio on December 14, 2007, when the studio was conducting testing for belt rank. After Lucas and the other kids were successful in achieving their new belts, a party was held at a classmate's home, and Dee and the victim spoke during this party. The two often spoke of the victim's struggle with child custody issues. The next day, Rubo called the victim about a shipment of items, some of which the victim needed to pick up, and the victim met Rubo at the karate studio at around 7:15 or 7:30 p.m. While the victim was at the studio, she spoke with both Rubo and Bobby Austin, a karate instructor or "sensei," about being upset that she did not know where the Defendant had taken Lucas that weekend. Both Rubo and Austin encouraged the victim to try to speak with the Defendant in a positive manner about Lucas. Rubo described the victim and the Defendant's relationship at that point as "distant" and "volatile," with the pair saying "as few words as possible to each other."

Bobby Spicer, the victim's neighbor, testified he had lived in his house for nineteen years and, as such, knew both the Defendant and the victim, whom he described as his "friends." Spicer recalled the Defendant's moving out of the house and recalled the victim and the Defendant thereafter engaging in a custody dispute. The Defendant called Spicer one day in August complaining that the victim had called him an unfit parent, said he was not taking care of his son, and had initiated proceedings to collect child support from him. Spicer last saw the victim on the Saturday morning before her death. He said when he went to bed at 10:30 p.m. on Saturday night the victim's car was not yet home. Her car was present at the house at 6:00 a.m. when he awoke. Spicer noted that the victim's curtains to her sliding glass door were blowing at around 10:00 a.m., but he did not learn of her death until her parents arrived at around 3:00 p.m. He offered for her parents to come into his house and wait for the police to complete the search.

Spicer testified the Defendant called him from a telephone number different from the Defendant's cell phone number at 9:55 p.m. and said he heard the victim was found dead. He asked how she died and seemed upset that he found out from someone at the karate studio rather than a family member. The Defendant told Spicer he had been out of town and had just returned. The Defendant asked Spicer for details of what the police had found, but Spicer said he did not know. Spicer never saw any signs of violence between the Defendant and the victim.

Michael Elliot testified he knew the victim from junior high school, and the two lived near each other as adults. On December 15, 2007, Elliot left his house at around 11:45 p.m. to get a drink at a nearby gas station, and he passed the victim's house on the way. He saw the victim inside, and she appeared to be hanging a picture or a clock on a wall inside the home. Elliot said that around 6:00 or 7:00 p.m. he saw lights coming from a four-wheeler in the woods behind the victim's home, and he reported this "suspicious" activity to the police.

Todd Brown testified knew the victim from the karate studio, and the victim had come to his house to bring Lucas to play with his children. Brown, Brown's wife, and the victim had also all taken the children out to eat. Brown last saw the victim about a month before her death when they were both dropping their children at school. Someone from the karate studio called him on December 16, 2007, and told him that the victim had been murdered. Brown went to the karate studio, where friends of the victim's had congregated, and he saw the Defendant walk into the studio, "sniffling." The Defendant said another karate patron, Brandon McKinney, called him and told him that the victim was murdered. Brown asked the Defendant where Lucas was, and the Defendant told them he was with Tanner Long, a fifteen or sixteen year old boy who Brown knew lived with the Defendant and called the Defendant "Dad." The Defendant told Brown he had been hunting in Lewisburg that weekend before learning of the victim's death. The Defendant then went straight into the office of the karate instructor, Austin. Austin, who Brown described as "pretty upset," made the Defendant leave, telling the Defendant he was

on his way to the sheriff's office. The Defendant said he too was on his way to the sheriff's office.

Mitch Shannon testified the victim retained him in June 2007 to represent her in her custody dispute against the Defendant. He filed a petition for paternity and to establish a parenting plan in late June or early July of 2007. At the first hearing on the case, the court allowed the Defendant visitation during the week and on the weekends. In September 2007, at another hearing, the trial court reduced the Defendant's visitation by giving him visitation only on the weekends and by eliminating overnight visitation on Sunday. In December, Shannon and the Defendant's counsel wrote a number of letters to each other regarding the Defendant's violations of the court-established parenting plan. Shannon intended to ask the court to sanction the Defendant based upon these violations. The two attorneys were also at odds over the fact that the Defendant had not responded to interrogatories, as was required. Shannon sent the interrogatories on November 2, 2007, and had not received the Defendant's responses by December 2, 2007. After a number of phone calls between himself and opposing counsel, on December 11, 2007, he sent opposing counsel a letter saying that he would file a motion to compel on December 14, 2007, if he still had not received the responses to his interrogatories.

Shannon recalled that one of the issues involved in this case was that the Defendant continually called the victim. During their meetings, he would call her sometimes up to fifteen times. Shannon and the Defendant's attorney attempted to keep the parties at arms length, but the Defendant still called the victim continually. Shannon recounted several conversations between the Defendant and the victim, one of which occurred on August 30, 2007. On that day, the victim came to Shannon's office to discuss the Defendant's habit of not bringing Lucas back as instructed. The Defendant kept repeatedly calling the victim during the meeting, and the victim finally answered the phone and put it on speaker. Shannon heard the Defendant be "abusive" to the victim, calling her stupid and an idiot. The Defendant told her that they could work things out on their own, and, when she refused, he said, "Look, I can get rid of your attorney. It's not a problem. I know where he lives. I've followed him home. You just give the word and I'll handle it."

Kim McCord testified she knew both the victim and the Defendant because their sons took karate at the same karate studio. McCord recalled an evening when the police were called to the karate studio. She described the events leading up to police being called, saying that, when she arrived at the karate studio, she saw the victim standing outside crying on the telephone. She asked the victim if she was okay, and the victim nodded her head, so McCord went inside. To McCord "[s]omething didn't feel right," and she noticed that both of the victim's parents were inside the studio with Lucas who was not dressed in his karate gee, which was unusual because he usually came dressed for class. McCord went outside and asked the victim about Lucas's karate gee, and the victim said that she did not have it and that the Defendant had it and refused to give it to her. Once karate class was in progress,

McCord saw the victim run inside the studio, straight up to the karate instructor, Austin. McCord explained that this was against protocol, which required that one bow before approaching the instructor. Austin quickly left with the victim and went outside, where the Defendant had pulled up in his truck. Austin gestured for the Defendant to leave, and, when he did not, Austin called the police. The police were still at the karate studio, one speaking with the victim and one speaking with the Defendant, when McCord left.

Bobby Austin, the karate instructor, testified he met the victim and the Defendant at the same time, when the two enrolled Lucas into karate lessons. Austin said he saw the victim and the Defendant interact on a regular basis, and the two did not seem to get along. Recalling the evening police were called to his studio to deal with the Defendant's behavior, Austin said the victim came into the studio crying and upset, saying that the Defendant had grabbed her and would not leave her alone. Austin stopped his class, went outside, and asked the Defendant to leave. The Defendant refused, telling Austin that he was on public property and not required to leave. Austin returned to the school and called the police, who arrived and spoke with the Defendant. After speaking with police, the Defendant left the karate studio.

Austin recalled another incident three weeks before the victim's murder. He said the victim had approached him about having a birthday party for Lucas at the karate studio on December 15. She mentioned to Austin that it was the Defendant's weekend to have Lucas, and she was unsure whether he would allow her to have the party. Austin spoke with the Defendant, who agreed to have the birthday party on that date. The Defendant later told the victim that he was not going to bring Lucas to the birthday party. After learning of this, the Tuesday before the victim's death, Austin attempted to call the Defendant into his office to discuss the birthday party. Austin said he first spoke with the Defendant alone, and the Defendant denied that Austin had told him about the party. Austin asked the Defendant if he could bring in the victim so that the three could discuss the situation, and the Defendant said, "No. I really don't want to talk to her. I can't stand to be in the same room with her."

Austin invited the victim in anyway, and the conversation went poorly. The Defendant told them both that he was taking Lucas out of town for the weekend. Austin and the victim asked where they were going, but the Defendant responded that he did not have to tell them where he was taking Lucas. He said he had been planning "this" for awhile now. Austin recalled being confused by the Defendant's response because the Defendant did not say he had been planning the "trip" for awhile but said only he had been planning "this" for awhile. Further, Austin said the Defendant was not the "type of person to plan a trip." Austin described the Defendant as "just pure evil" and said the victim did not understand why the Defendant hated her so much. The Defendant told Austin that the victim was trying to take Lucas away from him.

Austin testified about the evening that he learned that the victim had been killed, saying that people began coming to the studio when they learned of her death. The Defendant came to the studio and said, "I just heard. I just heard." The Defendant said he had been in Lewisburg, and Austin noticed he was driving a white two-door Corolla. The Defendant tried to appear as if he was crying, but Austin did not see any actual tears.

On cross-examination, Austin agreed that the Defendant had approached him about being a mediator between the Defendant and the victim. Austin said, after the incident where police were called, he told the Defendant that he must call all the parents of the children who were present at the karate studio and apologize before Austin would allow him to return. Austin believed the Defendant complied with this request. Austin agreed that the victim was talented at karate and had achieved an intermediate level. She had taught herself self-defense as part of her karate training.

Mike Hoekstra, a deputy with the Rutherford County Sheriff's Office, testified he responded to a call at the victim's house about a possible corpse on December 16, 2007. The victim's parents were there when he arrived, and, after viewing the victim's body, he asked her parents to leave because he considered the house a crime scene. After three or four minutes, other officers arrived, and the officers created a crime scene log. Deputy Hoekstra created a report, in which he opined the method of entry into the victim's house was "forced." George Chew, a paramedic with Rutherford County Emergency Medical Service, testified he responded to the victim's house, where he found her body on the bed with her hands bound behind her. She did not have a pulse and appeared to have a gunshot wound to the back of her head.

Detective Bryant Gregory, with the Rutherford County Sheriff's Office, testified he responded to a call about a possible homicide at the victim's house. Upon his arrival, he examined and photographed the scene. He noted that the victim's purse and jacket were on the kitchen table, and her thermostat was set to sixty-nine degrees. The detective identified photographs of the victim's body, one of which depicted a scratch to her left arm. Detective Gregory examined the victim's car, in which he found a bag from Wal–Mart. He also attended the autopsy of the victim's body, where he collected bullets the medical examiner retrieved from her body.

Dr. Amy McMaster, with the Nashville Davidson County Medical Examiner's Office, testified she conducted the autopsy on the victim's body. The victim, who was thirty-six at time of her death, had three gunshot wounds to her head; her hands were bound with black plastic ties; and she had small abrasions and a bruise on the back of her right hand and abrasions to the back of her upper left arm. The doctor determined that the gun was fired from a few inches away from the victim's head, and she successfully retrieved three bullets from the victim's head. From these bullet wounds, the victim suffered bleeding in her brain, multiple fractures to

her skull, bleeding in her eyes, and injury to her brain. Death, the doctor opined, was nearly instantaneous.

Elizabeth Bradley testified she moved to Tennessee in August of 2007 and met the Defendant through her son Julian Bradley. Julian and Tanner Long, the teenager who lived with the Defendant, grew up together in Texas. When Bradley first moved to Tennessee, she lived with the Defendant in Smyrna for four-and-a-half weeks. Bradley said, while living with the Defendant, she met Lucas but not the victim. Bradley recalled that the Defendant was "very upset" with the victim because he wanted more time with his son than every other weekend and Tuesday nights. The Defendant said he was not willing to pay child support because he felt like he would be paying her mortgage. Bradley said it was clear the Defendant did not like the victim because he spoke about her using derogatory remarks while around Bradley and Lucas, calling the victim stupid and saying that she did not know what she was talking about.

Bradley recalled a time when she loaned the Defendant her car on a night that the victim and Lucas had gone to karate. The Defendant wanted to watch and see how late the victim kept Lucas at karate, because the parties argued over the fact that Lucas was at karate after his bedtime. The Defendant told Bradley that he wanted to use Bradley's car because no one would recognize him in that car. On cross-examination, Bradley agreed that the Defendant was trying to prove that the victim was not getting Lucas to bed at the same time she demanded that he have Lucas in bed.

Charles Hardy, with the Tennessee Bureau of Investigations ("TBI"), testified he responded to the scene of the victim's murder and assisted in the investigation. Agent Hardy identified multiple pictures and sketches of the scene. The agent did not see any signs of forced entry but noticed that the victim's purse and keys were on the kitchen table. Law enforcement personnel found the victim's body dressed only in a black camisole and positioned face down, with her head toward the foot of the bed. Officers took multiple items for further testing, including a bullet they found between the victim's head and the mattress. Agent Hardy identified photographs of possible muddy shoe tracks in the victim's house. Agent Hardy took swabbings of blood stains, all of which were later determined to be from the victim or Lucas.

Agent Hardy received multiple items to test as part of this investigation, including the Defendant's boots and several items from the house of Eve Barger, a woman with whom the Defendant sometimes stayed. The agent testified he examined the Defendant's boots and found the presence of blood on the Defendant's right boot. He could not, however, generate a DNA profile from the stains on his boot. On the fitted sheet found at Barger's house, Agent Hardy found blood, but he excluded the victim as the source of that blood and determined the blood belonged to Barger. The agent did not find the victim's blood on any of the Defendant's clothing, his

car, or the sheet upon which the Defendant slept the evening of the the victim's murder.

Oakley McKinney, a TBI agent and expert in latent fingerprints, testified that the only fingerprints he found at the crime scene belonged to the victim. Agent McKinney also examined fingerprints recovered from Barger's home, but he was unable to match the prints to either the victim or the Defendant.

The State presented evidence about the gun and the bullets used to shoot and kill the victim. Shelly Betts, with the Firearms Identification Unit of the TBI, testified she went to the scene of this murder, where she collected one fired .32 caliber metal jacketed bullet from the victim's mattress, and the medical examiner gave her three other fired bullets the examiner retrieved from the victim's body. Betts also examined two unfired .32 bullets that police recovered from the Grand Prix belonging to Barger, one of which police found in the gear shift area and the other of which police found in the console. These two unfired bullets were Winchester Western brand .32 auto caliber full metal case cartridges with knurled canalures. The four fired bullets, found at the scene and in the victim's body, were .32 auto caliber metal case bullets with canalures that had all been fired through the barrel of the same firearm. The four fired bullets were the same type, design, and bullet weight as the unfired bullets found in Barger's Grand Prix. Agent Betts determined that the fired bullets were fired from a gun that was manufactured by one of multiple manufacturers, one of which was a Llama. The gun would have held seven or eight cartridges in its magazine. Also distinctive about this gun was that it may have misfired because officers opined that, although there were four bullets found at the scene, the gun seemed to only be fired three times, judging from the final resting place of the bullets. It appeared that the gun expelled two bullets at the same time on one occasion.

On cross-examination, Agent Betts testified that a .32 caliber weapon is relatively common, and one could purchase .32 auto seventy-one grain full metal casings at Wal–Mart. The agent agreed that at least ten manufacturers could have produced the type of gun used to shoot the victim. The agent testified that there were no cartridge cases left at the crime scene, so either the bullets were shot from a revolver or the shooter gathered and took with him the casings.

Agent Betts contacted Paul Szabo, who was employed with the Winchester Ammunition Division, and he assisted her in the investigation of the victim's murder. Szabo testified that Agent Betts showed him the product symbol, knurled canalures, from bullets found in this case and asked him when Winchester last used that particular product symbol. Szabo testified the last time Winchester manufactured that type of bullet was in 1977. Further, on the shell case, there was an imprint showing that the brand of shell case used on the bullets in this case was last manufactured in the late 1960s.

Police also contacted Eve Barger, whose testimony is summarized in its entirety below, who told them that a gun was missing from a gun bag she kept in her closet. She said the gun bag belonged to her ex-husband, and she took it from him after their divorce. The police then contacted Barger's ex-husband, Phillip Keith Barger, who testified at trial that the two were married for thirteen years and lived in Lehigh Acres, Florida, while married. During this time, Phillip stored his weapons in a locked combination safe in their home. Sometime after their divorce, Eve Barger moved to Lewisburg, Tennessee, and Phillip moved from the house they had shared. She called Phillip and asked him if he had retrieved his weapons from their home. After this conversation, Phillip went to the house to retrieve the guns and found that only two guns remained in the safe. Accordingly, he filed a stolen guns report with the police.

Phillip then identified a green gun bag police found in Eve's closet, and he said the bag belonged to him. In the bag, he found a rifle scope, two pairs of eye protective glasses, a gun lock key, targets, .40 caliber Winchester Smith & Wesson rounds, and two boxes of seven millimeter Magnum shells. Phillip Barger said the last time he saw the bag it also contained a .32 Llama pistol, which occasionally jammed upon firing. Barger had "traded" with a friend of his for that particular pistol nine or ten years prior, and the gun came with ammunition. Barger testified that a sergeant from the Sheriff's Department in Florida contacted him to ask him if he had any ammunition for his .32 Llama pistol, which he did. He gave the ammunition to the sergeant. Sergeant Michael Christiansen testified he collected the .32 ammunition from Phillip as Phillip had testified.

Jeffrey Gilley testified he met Eve Barger through the internet, after which the two started dating. After meeting a couple of times, the two decided Barger would move into his home, where the two resided for approximately four months. During this time, Barger told him about a pistol that she had that was jamming or would not "feed right on the shells." Gilley offered to fix the gun for her, and the two went to her home in Lewisburg and retrieved a .38 Special, a Llama .32 semi-automatic pistol, and a stainless steel .410 shotgun. Gilley identified the green gun bag presented by the State and said that it was the same bag they used to transport the weapons to his parents' house, where he was going to attempt to fix the gun. Gilley said he fired and cleaned a .32 Llama semi-automatic pistol, which had been cracked somehow on the right-hand side and had a slide that had been welded on. Gilley did not notice the gun jamming when he fired it, so he loaded it and returned the gun to the green bag after he had cleaned it. Gilley said, when Barger moved out of his home, she took with her the green bag and the guns.

Scotty Pace, a personal trainer and vending machine owner, testified he had known Eve Barger for several years, and the two had met via the internet. The two spoke online for a month or two before they met in person in Fort Meyers, Florida, where Pace spent two or three nights with Barger, meeting her friends and family. Pace described their relationship as platonic and said the two remained friends at the time of trial. Pace said that, while he was in Florida, he helped Barger, who was going

through a divorce, move rifles from the house she shared with her husband to her parents' house. Pace said that, after Barger moved to Tennessee, the two started a vending machine business together, but Barger ceased her involvement with the venture because she had other full-time employment and did not feel she had enough time to participate in the vending machine business. Pace, therefore, took over the business.

Pace testified that, in December 2007, Barger called him from the police department and asked him to come and get her. He did and took Barger back to his house, where she called the police and told them she wanted to retrieve some clothing from her house. Barger refused to tell Pace why she was at the police department, and she appeared scared and nervous. Pace took Barger to her house, where the police met her, and she got some of her clothing and other necessities. She then spent the night at Pace's house.

At 4:00 a.m. Barger, who was in "tears," awoke Pace and told him that she would tell him what happened but that she was scared. Barger told Pace that she was dating a man who told her he had killed his "ex" and Pace understood her to mean the man's ex-wife or ex-girlfriend, with whom the man had a child. Barger said she told the man that, if he was kidding she wanted him to stop, and if he was serious she wanted him to leave. Barger told Pace that the police were questioning her about the victim's murder, but she told them nothing because she was scared. Pace told Barger she needed to speak with an attorney and then tell the police what she knew. Pace recommended his attorney to her, and, after Barger spoke with the attorney, Pace took her to the police department where Barger told police what she knew.

On cross-examination, Pace agreed that he had threatened to blow up Barger's car, but he said that he was "messing around" because she was like a sister to him. Pace agreed that he had been to Barger's house before and that, the week leading up to the victim's murder, he had spoken with Barger on the phone.

Eve Barger testified that she lived in Lewisburg, Tennessee, and had lived there since March 2007, when she moved to Tennessee from Fort Myers, Florida, after separating from her husband. Barger, who was the customer service team leader at a Publix Supermarket, said her parents, who resided in Florida, owned the forty-eight acres upon which her home in Lewisburg sat, and she lived at the house alone at the time of the victim's murder. Barger recalled meeting Scottie Pace, who later became her best friend, through the eHarmony website, and she met Pace in person when he visited her while she still lived in Florida. She confirmed that Pace helped her move some of her husband's guns from the home she shared with her husband to her parents' home. Barger identified a photograph of her closet and identified in it the gun bag that Pace helped her move while she lived in Florida. Also in the closet were a .410 gun, other shotguns and rifles, and a crossbow.

Barger recalled that, after she moved to Tennessee, she met the Defendant in September 2007 through the website eHarmony. The two chatted online for a couple of weeks before meeting in person at an Exxon gas station, after which the Defendant followed her to her house. Barger drove her Pontiac Grand Prix GT, and the Defendant followed her in his Ford truck. The Defendant began coming to her home "once or twice a week at first," sometimes staying with her overnight. One time, Barger went to the Defendant's house in Smyrna. Eventually, the Defendant brought both of his sons, Tanner Long, who was seventeen years old, and Lucas, who was five years old, to her home, where she met them both. Barger said both boys had spent the night at her house twice.

Barger testified that, at some point, she learned that the Defendant had gone to her house when she was not present. One morning after he spent the night at her house, Barger left for work with the assumption that the Defendant planned to leave her home to go to work. The Defendant in fact left her house, but he later called her and said he was eating a sandwich at her home. She asked him how he got back into her home, and he said he used a credit card. The Defendant also told her when he went for hikes with his sons on her property, and, when she returned after these occasions, she would find things moved in her house, so she assumed he entered her home.

Recalling the events of the weekend of the victim's murder, Barger testified that, the Tuesday before that weekend, the Defendant called her and said he wanted to take the boys for a hike on her property. He then told her that his ex-girlfriend, the victim Atkin, whom he "hated," had planned a birthday party for Lucas, so he could not take the boys hiking because he had to attend the party. The Defendant was upset that the victim had planned a party for his weekend with Luke and said she should have waited until it was her weekend. Barger, therefore, did not expect to see the Defendant that weekend, but, on Friday, the Defendant called her and told her the party was cancelled. She spoke with the Defendant at 11:30 a.m. on Saturday December 15, and he said he was going to her house to take the boys hiking and asked if it would be okay if Long's friend "Donovan" joined them. She spoke with him again at 3:00 p.m., and the Defendant was outside with his boys hiking. She called him back later and jokingly asked him to make dinner for her if he was planning to be at her house when she arrived home. When she arrived home at 8:00 p.m., the Defendant had dinner prepared for her, and Donovan was not present. Barger gave Lucas a birthday present, a remote control helicopter, and went to Wal–Mart in Lewisburg at around 9:00 p.m. to get batteries for the helicopter. Barger also got pancake mix at Wal–Mart, so she could make pancakes in the morning.

When Barger returned to her house, she retrieved some clothes from the dryer, folded them, and then watched TV in the living room with the Defendant, who was wearing boxers and a shirt, Long, and Luke, for about forty-five minutes. At around 11:00 p.m., Barger told the Defendant and the two boys that she was going to bed, and she went into her room, where she changed into a nightgown and called her

sister and also another man she had begun dating, Shawn Ferguson. Barger assumed her guest would sleep in the rooms that they slept in the first time they spent the night, Long in the spare room and Lucas and the Defendant in the living room. Barger went to sleep alone in her bedroom between 11:30 and 11:45 p.m. At some point thereafter, the Defendant entered her room, gave her a kiss, and told her goodnight.

Barger recalled that, after she fell asleep, the Defendant came back into her room and asked her to listen for Lucas, explaining that he was going to take Long to a tree to look for a deer. Barger was awakened later by Lucas crying, so she opened her door and saw Lucas, who asked her where his Daddy was. Barger told Lucas that the Defendant would return shortly and asked him if he would like to lay in bed with her, which he did. The two got some of Lucas's favorite toy dinosaurs and brought them to bed and played for awhile. Barger tried twice to call the Defendant but her calls went to his voicemail. The Defendant, wearing jeans and a black long sleeved shirt, returned at around 5:00 or 5:30 a.m., while she and Lucas were still awake, and got into the bed between she and Lucas. Barger said the following then occurred:

> I was laying there and I had my back to him. And I could hear him shifting around and he was sobbing like he was crying and sniffling. And I rolled over and looked at him and I said, "Scott, what's wrong with you?" And he shook his head as to say nothing. A couple of seconds later I asked him. I said, "Scott, what is wrong with you?" And he looked at me and he said, "You're going to hate me." And I said, "I will never hate you." And I said, "What is wrong?" And he looked at me and he said, "I just killed [the victim]."

Barger said she asked the Defendant, "What?" and "Why?," and the Defendant said he did not know and that he just could not take "it" anymore. She said she asked him if he was being serious, and he said, "Yes," and then asked her what he should do. Barger said:

> I said, "You need to turn yourself in." And he said, "I can't do that." He looked at me again and asked me, he said, "Promise me something." And I said, "Yes, anything." And he said, "Promise you'll always be my friend." And I said, "I will." I started to ask him how he did it and I stopped myself and told him, I said, "Make me a promise." And he said, "Anything." And I said, "Promise if I ever ask that question again you won't tell me." And he said okay.

That concluded her conversation with the Defendant. Barger laid in bed awake until Lucas awoke, and she then made him pancakes and bacon. She saw Long still in the spare bedroom. The Defendant awoke fifteen or twenty minutes later, and the four of them ate breakfast together and then watched football.

Barger testified that, at this time, she still was unsure whether she believed the Defendant. She spent the day with him, Long, and Luke, and, when there was a break in the rain, they would fly Lucas's helicopter. Barger left the house only one time that Sunday and that was to go to an ATM to retrieve gas money for the Defendant.

Barger described burning some trash with the Defendant, saying that she had asked the Defendant on Saturday to help her burn some of her trash, and he said he would do so on Sunday. She reminded him of this on Sunday, and she and the Defendant went to her barn on her property to look for something to burn her trash in and found a barrel. They brought the barrel back to her house and placed it in her driveway where she usually burned trash. She placed two bags of her trash in the barrel along with the box Luke's helicopter had arrived in and then went back inside to cook dinner. She left the Defendant, who still wore jeans and a black shirt, outside near the barrel. Barger placed three or four other bags of trash in her carport, so the Defendant could burn them, which he did. Barger denied that she owned a denim purse or that such a purse was in the trash that she burned. She said that she would give away her old clothing rather than burn it.

Barger said that, after dinner, she gave the Defendant gas money and then helped him jump start the battery in his truck. The Defendant left in his truck with his two boys at around 7:30 p.m. When the Defendant left he was no longer wearing his jeans and dark shirt but had changed into a polo and khaki pants that were at Barger's house from when she had laundered some of his clothing.

At around 8:45 p.m. that evening, the Defendant called Barger and said his friend Brandon McKinney had called him and told him that they had found the victim dead. Barger said she acted like "it was the first time I had heard it" because she was "in shock." Barger testified that, while she was not scared of the Defendant, she was scared that she knew what he had done. The Defendant told her he was going to try to find "the karate instructor" and see if he knew anything. At around 10:45 p.m. the Defendant called her back, and she asked him if he had found out anything, and the Defendant responded negatively.

Barger said she did not call the police because she was scared to get involved in the "whole situation." The next day Barger saw on the 12:00 p.m. news that the victim had been murdered, and she became scared. After speaking with the Defendant briefly a few times during the day, Barger received a phone call from the Defendant at 9:30 p.m., and he told her he was going to the Sheriff's Department. He then called her while he was there and asked if she could keep Lucas for a couple of days until the Defendant was cleared, and she agreed. She was, however, unable to watch Lucas twenty-four hours a day because she had to work, so the child custody worker in charge of Lucas would not release him into her care.

Barger recalled that Detective Troy Hooker called her and left her a voicemail message while she was at work on Tuesday and that she called him back the same day. She said she drove to the Sheriff's Department, where she met with Detective Hooker for approximately three hours before taking him to her house to look at the firearms located in her home. Barger said she did not tell the detective the entire truth at this point because she was attempting to protect the Defendant, whom she loved. At her house, the detective looked in her closet, where she kept her guns, and in the gun bag located in her closet. Barger looked into the bag with the detective, and she noticed that two guns were missing, a semiautomatic pistol and the revolver she had placed on her night stand Monday morning after she saw the news that the victim had been murdered. She told Detective Hooker that the semi-automatic weapon was missing, as well as the extra clip belonging to the weapon, and, on Wednesday, police came and retrieved the bag from her. Barger gave the police permission to search her home for the missing weapon and to search her car. Barger agreed the police found two bullets in her car, which she denied having placed in her car.

Because she did not have a means of transporation [sic], Barger called her friend, Scottie Pace, to pick her up from the Sheriff's Department. She told Pace that the Defendant told her he had killed the victim and that she had not yet told the police. Pace contacted his attorney, encouraged Barger to speak with the attorney, and then took Barger to the Sheriff's Department, where she told the police Detectives Mayercik and Hooker the truth.

Barger said the Defendant knew that she kept firearms in her closet because he retrieved a rifle she stored in her closet every time he hiked on her property. Barger said she normally kept her car keys in her purse, which she kept in the dining room. Barger said that she did not burn any clothes on the day that the Defendant burned trash at her home and that she had never burned any clothes in that barrel. Barger said she took old clothes to Goodwill rather than burn them.

Barger testified Detective Mayercik asked her to record her conversations with the Defendant, and she agreed. Those tapes were played for the jury. In the first recorded telephone conversation, Barger said she was calling to see how the Defendant was doing. She said she was getting scared and needed to talk to him about a couple of things. The Defendant said he could not tell Barger where he was because he knew that there was something going on because she had her telephone off and would not answer it. She said that "they," referring to the police, were calling her all the time. He asked to talk to Barger on another phone line because Barger's phone may be tapped. Barger said "I told you I didn't know anything, but I need to know." The Defendant did not respond. The Defendant told her that both he and Long had a warrant out for their arrest, but the Defendant wanted to wait until after Christmas to turn himself in. The Defendant asked Barger if she was trying to set him up in any way. She said "I just wish you had never told me ... because it's killing me," and the Defendant did not respond. She said, "I don't hate you ... I am just scared." The Defendant again did not respond. The Defendant

told Barger that his truck was impounded because someone told the police that his truck was the last to leave the victim's house on the Saturday she was killed. The Defendant told Barger that she knew that was not true. Barger said, "Did you take my car?" and the Defendant responded, "No. I need to talk to you and I need it to be in a secure place where it is just you and I. I need to be able to trust you." The Defendant said, "I'm scared that the cops have gotten a hold of you and are using you to get me to come in." The Defendant opined that the police did not have "anything great" on him. Barger said, "If you did use my gun or whatever that could come back on me." She added, "I told you I didn't want to know details." The Defendant said "I don't know. I don't know what to do," and then, "I want to trust you so bad but I am scared." The Defendant said "You tell the truth. You tell them you went to bed and you woke up at 4:30 [a.m.]."

Barger told the Defendant she did not know why he could not just talk to her and why it had "got that far." The Defendant said "I'm afraid this sounds off." The Defendant told her that the police had Barger's phone tapped and that the police could hear everything that they were saying. The Defendant said, "[Y]ou have nothing to worry about you were sleeping the whole time. I am the one who had something to worry about." She asked, "[W]hy didn't you tell me I could have changed your mind," and the Defendant did not respond. The Defendant said, "I really miss you and I am really sorry for everything but I really need to get off of here. Can I trust you?" Barger responded, "Yes."

The Defendant said, "If I turn myself in I am going to jail and I'm never seeing [Lucas] again." Barger said, "I know." The Defendant told her "we are going to get through this.... Talk to me before you do anything else." Barger told the Defendant she would always be his friend, but she wanted him to do the right thing and be honest.

In the second recorded phone conversation, Barger told him that "they" took her phone today. He asked her whether "she ever washed the mud off her floor board." She asked him where the mud was from and he said he had just gotten mud in there, and he wanted to know if she ever washed it out. The Defendant said he was going to say "bye" to everybody and then come back and turn himself in. Barger asked, "[A]re you going to tell them?" The Defendant said he was just going to go to the police and tell them that he knew they had a warrant for him. The Defendant said he was "sorry for involving her in this in any way." Barger said, "I don't want to get in trouble for something I didn't do and something I didn't know anything about." The Defendant said, "[Y]ou're not." The Defendant said he was going tell the police the "truth" when he turned himself in. The Defendant said "I know you didn't know any better but I wish you hadn't mentioned that a gun was missing. They would have left you alone." He said, "Eve you know I can't talk on this phone."

Barger said "at this point they are saying everything is being linked to me." The Defendant said, "[T]here's no way. There's no possible way those casings could

match." The Defendant told her that the police were trying to get her to "tell on" him. The Defendant said he told a friend of the family that there was something about a gun "going on" and the friend told him not to worry because the victim was not shot. The Defendant said that the police were trying to get Barger to say something, but, if she did not know anything, she could not tell the police anything.

The Defendant said, "I just have to make inner peace with that if they convict me then I'm spending the rest of my life in prison. I just need a day or two to do that." I want to go say my goodbyes because "I am never going to see anyone again if they convict me.... I am going to be on death row. I am never going to see [Lucas] again." The Defendant said Barger was not going to come see him after "everything he had put her through." He said, "I've put you through a lot."

The Defendant said, "If the [police] say we think it's her, I will tell them the whole truth. Okay. And let's just leave it at that because we both know the whole truth.... Don't worry." He then said, "They are trying to get you to say something that you know nothing about."

Barger said, "Why didn't you talk to me things could have been so much different," to which the Defendant responded, "I know." Barger said, "you're a good person you just make awful decisions." The Defendant said, "I have my whole life." The Defendant said, "I would be better off dead," indicating that, if he were dead, Barger would not be in trouble, Long would not be in trouble, and he would not be a disgrace to his family.

In the third series of phone conversations, Barger told the Defendant that the police told her that they were going to arrest her, and she said that the police had not given her back her car yet. The Defendant said he would be back the next morning and he was going to turn himself in then. Barger said she was scared, and the Defendant asked why she was scared when she had done nothing wrong. Barger said the fact of her innocence meant nothing because police did not believe her. The Defendant said, "[T]hey will know once they talk to me." The Defendant said, in case anything happened to him between "here and there," he was writing "all this down on paper ....what happened."

Barger told the Defendant that, if he told the truth, he would still be able to see Lucas. The Defendant, crying, said, "I've already f* * *ed this whole life up." Barger told the Defendant to tell the truth because "of how much better [he would] feel," instructing him to "think about how much more you won't have to carry around." The Defendant responded, "that would mean the rest of my life, Eve." The Defendant said, "even as much as I was seeing [Lucas] that wasn't enough for me.... I just wanted to be his parent." The Defendant said Lucas would have to grow up without both his parents. Barger said, "[C]hildren go everyday to see their parents in jail," to which the Defendant responded emphatically, "Not for killing their mother!" The Defendant said, "I can't live with this."

The Defendant said the police were worried about "this f* * *ing gun and the gun ... has no relevance." The Defendant said he had calmed down a lot and had talked to some people. The Defendant said again, "[T]he gun has no relevance. They're telling you s* * * to try to get you to talk about something. You don't know anything." The Defendant said his friend who was an investigator for the Texas Rangers said that, if the police had anything "on" him, they would not be waiting for Barger to come in and talk to them but would be "coming" for him. The Defendant said that, when he told the investigator he wanted to just sign a full confession so the police would leave everyone else alone, the investigator discouraged him from doing so. The Defendant said he spoke with an attorney who told him not to talk to the police and not to tell the police something just to get other people out of trouble. The Defendant said the police could not take Barger to jail because the police had no evidence. Barger told him that the police advised her not to go to her house because they were still searching out there, and the Defendant said, "They can search all they want because there's nothing out there."

After the tapes were played, Barger resumed her testimony and said she called Detective Mayercik shortly before Christmas and told him she was out of tape with which to record the Defendant, and he told her not to worry. She asked if she should still answer the Defendant's calls, and the detective said yes. The following Wednesday, the Defendant called her, and, after a lengthy conversation during which she was crying, she told the Defendant she had told the police that the Defendant said he killed the victim. The Defendant said, "I want you to know that if [the police] put you in a room with me I'm going to look at you and tell them you're a liar."

Barger said she had never seen the Defendant with a gun, and he had never spoken to her about guns. Barger was online friends with Long, who had multiple pictures of himself in camouflage on his page. Long's MySpace page also indicated he liked hunting.

Barger testified that, when the Defendant returned from, as he told her at the time, taking Long to look for deer, he was wearing the same clothes he wore when he told her he was taking Long to look for deer. She said he seemed relaxed as he got into bed with Lucas and her. She said that, after Lucas fell asleep, the Defendant told her he killed the victim. The Defendant was "sobbing" and hugged her intermittently for the next four hours, until she got out of bed at 9:30 a.m. The rest of that day was "normal," and the Defendant did not act differently.

Barger agreed that the driveway to her house ran alongside her bedroom window and that it was a long driveway. She said her driveway was gravel and that, therefore, she could hear a car coming from a distance. She did not hear, however, the Defendant leave or return in a car on Saturday night or Sunday morning, December 14th and 15th.

Barger said the gun that was missing from her gun bag, the gun police suspected was involved in the murder, was an older gun that jammed. Barger said that, after the Defendant began burning trash, she saw the Defendant come inside and roll up his clothes on her bed. That was the last time she saw the Defendant's clothes he had worn the night before.

Answering questions from the jury, Barger testified she did not know when Long returned from deer hunting because he was in his bed when she awoke on Sunday morning. Barger said the Defendant changed his clothes after he started burning her trash, and, while burning the trash, he was wearing jeans and a long-sleeved, dark shirt.

In further redirect examination, Barger said the Defendant changed his clothes while she was at the bank retrieving money from the ATM. Because she was not at the house, she did not know what he did with the clothes he changed out of.

James Phillip Martin, with the Rutherford County Sheriff's Department, testified he examined the contents of a "burn barrel" that had been gathered from Eve Barger's house. In the barrel, which was a fifty-five gallon drum, Martin found aluminum cans, green beans, metal bands, oval pieces, a small burned box, what appeared to be some gloves, the tab from the back of a pair of Wrangler jeans, and copper rivets that appeared to be from Wrangler jeans. The Defendant was wearing Wrangler jeans at the time of his arrest. On cross-examination, Martin testified that the material he gathered that appeared to be gloves also could have been a hat. Martin said he was unaware of whether Barger was cleaning out her house around the time of the murder. Martin also agreed that no zipper to any jeans or pants was found in the barrel.

Linda Littlejohn, with the TBI, testified that she compared a print from the Defendant's boots with the partial shoe prints found in the victim's home and found that the two were not consistent. Agent Littlejohn also examined the cable ties that bound the victim's hands and found them inconsistent with a container of cable ties found at the Defendant's home.

The State rested, and the Defendant called to testify the lead investigator in this case, Detective Ralph Mayercik. The detective said that, at the start of the investigation, the police had several suspects, including the Defendant; a man named "Kenny" with whom the victim communicated via MySpace; Todd Burfield, the last person to see the victim at Wal–Mart the night of her death; and a firefighter whom the victim was dating at the time of her death. The officer said that the Defendant became a suspect early in the investigation despite the fact police initially had no information that he had ever previously harmed the victim.

Detective Mayercik testified he went to the Defendant's house more than thirty-six hours after this murder with a search warrant. The detective explained that the delay was caused by the "exceptional amount" of work required to process the crime

scene. The Defendant, who was bathing his child at the time, answered the door, did not attempt to avoid him, and, obviating the need for a search warrant, consented to a search of his home, garage, and truck. The Defendant agreed to go to the police station to give a statement, even though he was not "in custody" at that time.

The detective believed the victim was shot from a gun in close proximity to her head and said police did not believe that anything was used to muffle the sound of the gun. None of the victim's neighbors, however, heard any gunshots. From his investigation, it appeared that the person who had entered the victim's home had climbed over her back fence and entered her house through her sliding glass door.

Detective Mayercik testified the police eventually seized and searched the Defendant's truck, and they found nothing in it to connect the Defendant to the victim's murder.

The detective said that another officer investigated a "suspicious" vehicle in the area of the victim's home on the day of her murder and also a "suspicious" man in the same area. Both, he learned, were in the area before the victim returned home from Wal–Mart. The detective agreed that there was a carjacking, possibly involving a gun, in the area of the victim's home on the night of her murder.

On cross-examination, Detective Mayercik testified he timed the trip from Barger's house to the victim's house and reported the fifty-mile trip took him fifty-one minutes. He said that, during his investigation, he was unable to find any other suspect who had any other motive to kill the victim.

Glenn Rogers, an officer with the Smyrna Police Department, testified he responded to the call reporting the dispute between the Defendant and the victim at the karate studio. When he arrived, the Defendant told him that he had come to the studio to tell Lucas why Lucas could not spend the night with him. The officer noted that, while he spoke with the victim, he did not notice any marks on her body. The officer did not make an arrest, which he testified he would have done had he suspected that there had been an assault. On cross-examination, Officer Rogers testified he asked the Defendant to leave the property.

Wendy Pritchett testified she knew the Defendant because her children attended karate with Lucas. Pritchett worked at Auto Zone with a girl named "Christy," who was dating a member of the Atkin family. Christy told Pritchett that the victim had been killed and how she suspected the victim had been killed. After learning of the victim's death, Pritchett spent time with the Defendant whom she "trusted." On this occasion, Pritchett told the Defendant how Christy said the victim had been killed. On cross-examination, Pritchett said that, because the Defendant told her he wanted to speak with the Atkins, she went to the Atkins' house shortly after the victim's murder and asked them to speak with Defendant.

Brandon McKinney, Pritchett's husband, testified he knew the Defendant and the victim from the karate studio. He said he and the Defendant were "fairly close friends," and he was the one who informed the Defendant that the victim had been murdered. McKinney met the Defendant at the karate studio after he told him about the murder, and he saw the Defendant bent over and throwing up. McKinney described the Defendant as "upset." McKinney drove the Defendant from the karate studio to the Defendant's house. At the Defendant's house, the Defendant seemed "tore up," wandering around and saying he did not know how he was going to tell his son. The following Monday, McKinney drove the Defendant to the bus station because the Defendant wanted to go to Texas. The Defendant assured McKinney that he had not committed this murder.

On cross-examination, McKinney testified that, on the Wednesday after the murder, the Defendant called him and told him that his truck was broken down, so McKinney went to pick up the Defendant. He later learned that the Defendant's truck actually had been seized by the police. McKinney testified the Defendant used McKinney's cell phone several times to call Eve Barger after the murder, despite the fact that the Defendant had his own cell phone. The Defendant told him that he knew that the police were listening to his conversations.

Tanner Long, the Defendant's son, testified he was eighteen and had recently graduated from high school. Long recalled going to Barger's house with his father the weekend of December 14, 2007. He said he and the Defendant had planned this trip for a couple of weeks because Long planned to go to Texas for Christmas, and the Defendant wanted Long and Lucas to have "bonding" time before Long left. Long recalled they left Smyrna for Barger's house at around 1:00 p.m. on Saturday, and he and his friend "Donovan" were in a car following the Defendant, who was driving Lucas. They arrived at around 2:00 p.m., had lunch, and started hiking, carrying with them a shotgun and a rifle from Barger's closet. Long testified that the only gun remaining in Barger's ammunition bag was a revolver.

Long testified that everything was fine during the hike and that no one seemed mad. On their hike, the men noticed a tree stand used for deer hunting and, by it, a deer bed, which made Long want to go hunting the following morning. The men went back to Barger's house where his father prepared dinner. Barger returned at around 8:30 p.m., and they ate dinner. Long said he sensed no tension from anyone before Barger went to bed at 11:00 or 11:30 p.m. Long said he watched a movie that started at 12:00 a.m. and that he heard the Defendant asleep and snoring on the couch until at least 1:45 a.m. Long said he got up and used the computer to talk to his friend from 1:45 a.m. until 2:45 a.m., and the Defendant slept on the couch the whole time. Long testified that he fell asleep around 3:00 a.m. The next thing he recalled was the Defendant's alarm going off at 4:00 a .m., and the alarm woke him up, so he turned it off before the Defendant did. He and the Defendant got up, and the Defendant walked him to the tree stand. Long stayed in the tree stand until 8:00 a.m., when he returned to the house and had breakfast with Lucas. Long said

everything seemed "like a normal day" when he returned. They watched football and played games with Lucas.

Long testified that Brandon McKinney called the Defendant while he and the Defendant were on their way home and informed the Defendant that the victim had been found dead. The Defendant began to cry and asked how he was going to tell Lucas. He asked Long to drop him off at the karate studio and to take Lucas home.

On cross-examination, Long testified he did not wear any orange the day he went deer hunting and said he did not have a valid Tennessee hunting license. Long identified pictures posted on his MySpace page that were taken on December 22 of himself, the Defendant, and other family members. One of him and his father had a caption that read, "You mess with me and you mess with him." Long testified that his father likely had on Wrangler jeans when they went hiking the day before the victim's death, saying that Wrangler and Levi jeans were all his father wore.

Long said that, when the Defendant dropped him off near the tree stand the morning of December 16th, he told Long that he would come back out if he heard a gunshot. The Defendant then went back to the house. Long said he stayed in the stand for two-and-a-half to three hours. When Long returned to Barger's house, he tried to go to bed, but Lucas came in and jumped on him, so they got up and ate breakfast.

Long agreed that, after the Defendant learned about this murder, the Defendant asked Wendy Pritchett to go to the victim's parents' house. Long did not know why the Defendant himself did not go to the victim's parents' house, which was on the same street as the Defendant's house.

The Defendant testified that he met the victim in 1996 while the two were both working out at a fitness club. The first couple of years of their relationship went "really well," and, while the couple had "rocky" times and gradually grew apart, they never yelled or argued with great frequency. After having grown apart for some time, the Defendant moved out of the victim's home in May of 2006 and into a rental house, which she helped him find, near her parents' home. For six or seven months after the Defendant moved out of the victim's home, the two maintained an intimate relationship, which ceased in December of 2006.

The Defendant said that, when he and the victim first separated, he had Lucas Tuesday and Thursday nights and every other weekend. Lucas stayed with the victim's parents on Tuesdays and Thursdays during the day and was in daycare on Monday, Wednesday, and Friday. In July of 2007, the Defendant, who had fallen upon hard times financially, spoke with the victim about pulling Lucas out of daycare, which the Defendant was paying for at the time. The Defendant suggested that Long, who was out of school for the summer, could watch Lucas during the summer in order to save two months' daycare tuition. The victim, however, wanted Lucas to stay in daycare until he started school, and the Defendant told her he could not afford the daycare's tuition.

The Defendant said, shortly after this conversation, he was "shock[ed]" when he was served with papers showing that the victim had initiated court proceedings. He approached Austin, from the karate studio, and asked him to act as a mediator to assist him and the victim to work out a custody agreement. He obtained a copy of the victim's parenting plan and gave it to Austin, who would alternately speak with the Defendant and the victim. According to the Defendant, the victim wanted attorneys to work out the agreement, so she refused to work with Austin to mediate a custody agreement.

In part because the mediation with Austin was unsuccessful, the Defendant retained an attorney, Laurie Young, to represent him in the custody dispute over Lucas. He conceded that he had never paid child support but said he had never attempted to avoid paying child support. Further, he paid $400 per month for Lucas's daycare. He said, in November 2007, he received a set of interrogatories that he did not complete before they were due thirty days later. He explained that many of the questions related to his income and required him to obtain multiple tax records, which took "some time."

The Defendant explained his version of the events that led to Austin calling the police at the karate studio. He said Lucas was at work with the victim that day, and he picked Lucas up and took him to lunch. When he did so, the victim informed him that he could no longer watch Lucas at the karate studio because Austin did not want the Defendant there. The Defendant called Austin, who confirmed he did not want the Defendant at the studio. Despite this, the Defendant went to the karate studio, wanting to inform his son why he could not be there. Austin came out to the car and said he was going to call the police if the Defendant did not leave. The Defendant refused to leave, and Austin called the police, who arrived a short time later. The Defendant said he just wanted to see his son.

The Defendant said the following August, he and the victim had a court hearing on the custody case. As a result of that hearing, he lost some of his days of custody with Lucas. One point of contention between the Defendant and the victim was the Defendant's perpetual failure to return Lucas to her at the karate studio by 8:00 p.m. as scheduled, which resulted in the victim being unable to have enough time to take Lucas home, bathe him, and put him to bed. The Defendant said, even when he brought Lucas to the studio at 8:00 p.m., the victim did not leave the studio until later. To prove his point, he borrowed a car and watched how late she stayed at the studio. The Defendant denied ever following the victim's lawyer, Shannon, or ever saying that he knew where Shannon lived. The Defendant said he did not know where Shannon's office was located or what kind of car he drove. The Defendant acknowledged that he sometimes called the victim frequently, leaving angry messages, but he explained that he just wanted to see his son.

The Defendant said he learned from Austin on December 4th or 6th that the victim had planned a birthday party for Lucas on a Saturday in December. Austin did not

give him the date but merely asked if the Defendant and the victim could be in the same room together and both attend the party. He said it was not until December 11th that he learned the victim had planned the party for December 15, which was his weekend with Lucas. He planned to take both his boys hiking at Barger's house for the weekend. The Defendant recalled that Long was leaving to spend Christmas in Texas, and he wanted Long and Lucas to spend time together before Long left. The Defendant said Lucas loved to spend time with Long.

The Defendant said, despite his plans, he told Austin that the party could go ahead as scheduled. The victim called him on Wednesday, however, and told him she had cancelled the party. On Thursday, Austin called the victim and the Defendant into his office to discuss the situation. As a result of this conversation, the Defendant agreed to have Lucas to karate by 8:15 p.m. and not to wait in the parking lot to see what time she left the karate studio. The two also agreed to communicate better for Lucas's sake.

On that Friday, December 14, 2007, the Defendant picked up Lucas from the victim's parents' house. Shortly before 5:00 p.m., he took Lucas to the karate studio so that Lucas could take the test for his next karate belt. At the studio, the victim met him outside and gave him a pair of Lucas's pajamas that Lucas wanted to wear to the pajama party at school on the following Monday. The Defendant agreed to put Lucas in these pajamas before he took him to school on Monday. He said he and the victim did not exchange any angry words or looks. After the karate test, he and Lucas went back to his house and spent the night. The next morning, he and Lucas got up and waited for Long to awaken. Then, the three of them joined Donovan and went to Barger's house, stopping once for gas.

When they arrived at Barger's house, they ate sandwiches and went for a hike. Long brought with him one of the guns that Barger kept in her closet because Long and Donovan wanted to shoot the gun. The Defendant knew that Barger had a gun bag that she kept in her closet, because she had offered Long a gun on a previous occasion when Long saw a ground hog he wanted to attempt to shoot. This occasion was the first he learned that Barger had any guns, and he did not recall any other conversations with her about the guns she kept in her closet. The weekend of the 14th, however, he looked in the gun bag when Long brought the bag out to look for bullets. Long was looking for more .410 shells, and the Defendant saw quite a few .40 caliber bullets lying in the bottom of the bag. He and Lucas put those shells into an empty box. The Defendant said he saw the .38 revolver in the gun bag, as well as the other guns. He never saw any semi-automatic gun in the gun bag, and he told Barger this when she asked him about it the following Monday or Tuesday.

The Defendant recalled that, while hiking with the three boys, Lucas, Long, and Donovan, they saw the tree stand. Close to the stand, the grass was "laid down," and it looked like deer had been bedding there at nighttime. He and Long talked about Long going the next day to the tree stand to hunt. The men returned from hiking, Long and Donovan got more bullets to go shoot the .410, and he and Lucas

stayed in the house playing and watching television. Long and Donovan returned, and Donovan left at 7:00 p.m., after which the Defendant cooked dinner for the boys and Barger, who returned from work between 8:00 and 8:30 p.m. The Defendant confirmed that Barger gave Lucas a birthday present, a remote controlled helicopter, and then left to go to Wal–Mart to get batteries for the helicopter.

Later that evening, Barger asked him to help her burn her trash, and he agreed. Everyone was in the den watching television or on the computer until Barger went to bed at 11:00 p.m. The Defendant went into her room to tell her goodnight. The Defendant said that, when he was at Barger's house alone, he slept with Barger. When his boys accompanied him, however, he slept on the couch with them. The Defendant said he did not know where Barger kept her purse or her car keys, and he had never gone into her purse to get out her car keys. The Defendant said, after he said goodnight to Barger, he went back to the den, got on the couch with Lucas, and fell asleep. Long was still using the computer at this time. Before falling asleep, the Defendant agreed to wake Long at 4:00 a.m. so Long could go hunting.

Sunday morning the alarm went off at 4:00 a.m., Long woke him up, and he went and asked Barger to listen for Lucas while he took Long to the tree stand. The Defendant said he got back at around 5:00 a.m., and he noticed that the television was on in Barger's bedroom. Lucas was in the bed with Barger. The Defendant said he was wearing his clothes from the day before, and he got into bed with Barger and Lucas. Lucas asked the Defendant where he had been, and the Defendant told him that he had taken Long to the tree stand. Lucas asked why the Defendant had not awakened him so he could join them, and the Defendant said because Lucas was sleeping. Barger said she had tried to call the Defendant twice when Lucas woke up around 4:30 a.m. The Defendant explained he turned off his phone so as not to frighten the deer.

The Defendant said he woke the next morning, ate pancakes, and watched football. The Defendant acknowledged that he burned some trash for Barger but denied he burned his clothes with the trash. He testified he did not go to the victim's house the weekend of her murder and had not been there in over a year. The Defendant said he and the boys left Barger's house at around 7:30 p.m., and it was not until after this that he learned of the victim's death from Brandon McKinney.

The Defendant described how he then went to the karate studio and threw up in the parking lot because he was so upset about learning of the victim's passing. The Defendant said he went home and attempted to call the victim's family and the victim's neighbor to find out what had happened. Detective Mayercik came to his house the next day and asked to search it, and the Defendant consented to a search of his home and truck. The Defendant went with the officer that night to answer questions and give him a statement.

The Defendant explained that, after the victim's death, he was cautious during his phone conversations with Barger because he consulted with an attorney who told him that his phones were likely tapped. He said the reason he told Barger he wished she had not told police one of her guns was missing was he was concerned the police were gathering evidence to implicate Long and Barger in this crime. The Defendant explained that he asked Barger if she had vacuumed out her car because he knew that the police would have wanted the vacuum bag if they were looking for evidence. The Defendant said he had never had any shells in Barger's car and that the only time he was in her car that weekend was when they went to get a barrel to use to burn trash.

The Defendant said he went to Texas for Christmas because he knew that he could not see Lucas, so he wanted to be with Long and the Defendant's grandmother for Christmas. The Defendant said he received a telephone message from the Department of Children's Services reminding him he had a custody hearing for Lucas at 2:00 p.m. on December 26. He, therefore, returned from Texas earlier than he had planned. He willingly spoke with the detective after his return.

On cross-examination, the Defendant conceded that he described his relationship with the victim as being one based upon sexual attraction. He agreed he "almost" hated the victim at the time of her death. The Defendant said he called the victim multiple times a day because he wanted to see his son, and she was keeping his son from him.

The Defendant acknowledged that Long had testified that the Defendant was unable to carry a gun. The Defendant explained that he had previously been stopped by the police, and he gave them a false name. That led to a conviction, which prohibited him from carrying a gun.

The Defendant described one altercation between himself and the victim that became physical. He said the two were living in Texas with two-year-old Lucas when she hit the Defendant. In response, the Defendant pushed her and said if she ever hit him again she could go back to Tennessee without Lucas or himself.

The Defendant said he never had a key to the victim's house, and, while he lived there, she left the side door unlocked. The only time she locked the door was when she was going out of town for some period of time. He agreed that, while he lived with the victim, there were times when he left the victim's house and then returned after he knew that she had left for work. He explained that he sometimes did not have enough work for the day or sometimes he had to bid on a job.

The Defendant explained that part of the reason he did not want to respond to the interrogatories was because he had not filed tax returns for his work at his cabinet shop. He was working with a company in Brentwood to prepare the past six years of his tax returns in order to properly respond to the interrogatories.

The Defendant testified he changed clothes after burning Barger's trash because he had gotten something on the clothes he had been wearing. He said he threw the clothes he had taken off into the backseat of his truck and then gathered Lucas and Long to take them back to his house.

The Defendant agreed that he attempted to gather information about what had happened. That included seeking the advice of a Nashville attorney, who told him he should not know more than what the detectives had told him about how the victim had died and that he should not use his phone to discuss anything about the case because it was likely tapped. Further, he sought information about DNA and asked a friend if his DNA could be transferred to the victim or to the victim's house by Lucas, if he had touched Lucas. The Defendant agreed that, at some point after this murder, he attempted to avoid the police because he thought that they had a warrant out for his arrest.

When presented copies of text messages that he sent to another woman on the Saturday this murder occurred, he agreed that the messages included some explicit comments and that he had a "romantic interest" in that woman. The two texted back and forth until approximately midnight, after which the Defendant said he went to sleep.

Based upon this evidence, the jury convicted the Defendant of first degree premeditated murder.

*Reynolds I*, 2010 WL 5343305, at *1–25.

The post-conviction trial court held an evidentiary hearing on Reynolds's ineffective assistance of counsel claims on July 30, 2012. (Doc. No. 14-2, PageID# 3781.) In considering Reynolds's appeal of the post-conviction trial court's decision, the TCCA summarized that evidentiary hearing as follows:[3]

At the post-conviction hearing, the Petitioner testified that he had two attorneys at trial but that one attorney was the lead counsel ("trial counsel") in the case. The Petitioner was introduced to trial counsel through his attorney representing him in a custody matter ("custody attorney"). At the time that he retained trial counsel, he had no knowledge of an existing relationship between trial counsel and his custody attorney. However, he learned soon into trial counsel's representation that these two attorneys had a personal relationship.

---

[3]    Footnotes 4 and 5 are quoted directly from the TCCA's opinion, but are renumbered in the context of this opinion.

The Petitioner discussed with trial counsel whether his custody attorney should testify at trial regarding his parenting plan. At the time of his arrest for the offense related to this case, he had visitation rights. Previously, "hostility" had existed between the Petitioner and the victim, but at the time of the Petitioner's arrest, he "was actually trying to work things out with the victim." However, despite the Petitioner's urging with trial counsel, his custody attorney did not testify at trial.

The Petitioner also discussed with trial counsel the fact that the trial court's[4] wife worked with the victim's father and brother. To his knowledge, trial counsel never filed a motion for the trial court to recuse itself. The post-conviction court, through questioning of the Petitioner, clarified the fact that the Petitioner did not know at which office the trial court's wife worked or at which office(s) the victim's father and brother worked. At that time, post-conviction counsel objected to the post-conviction court's questioning of the Petitioner during the Petitioner's testimony.

The Petitioner confirmed that, prior to his trial, trial counsel visited him in jail and discussed "a little bit" of trial strategy. He stated, "If [trial counsel] had found out anything he would bring me that information and then we'd pretty much just talk." They discussed the Petitioner's videotaped interview with police, but trial counsel did not bring the video to the Petitioner for him to view it. Although the Petitioner asked to view both his statement and the video on several occasions, trial counsel never brought either of them to him. The Petitioner also never was provided with statements from other witnesses included in discovery. On cross-examination, he clarified that he received written statements from other witnesses but never received video statements.

The Petitioner did not know how many video statements were available, but he knew that "there [were] some." He did not believe that trial counsel adequately prepared him to testify at trial. According to the Petitioner, another attorney who assisted trial counsel in the case ("assistant trial counsel") spent a short amount of time preparing him to testify, but trial counsel never did so. He also felt that trial counsel was not prepared for trial and was ineffective in his representation.

On cross-examination, the Petitioner agreed that assistant trial counsel also came to visit him prior to trial. The Petitioner stated that "[o]nce or twice [assistant trial counsel] came by himself. And he came once or twice with [trial counsel]." He could not remember whether he wrote letters to trial counsel. However, the Petitioner identified the writing on several documents as his own handwriting.

Patricia Salido, the Petitioner's sister, testified that she discussed with the Petitioner trial counsel's representation of the Petitioner throughout his case. She also discussed with the Petitioner the potential "connection" between the trial court's wife and the victim's family. She stated that it was trial counsel who informed her

---

[4]     The same judge presided over the trial and post-conviction hearing.

of this connection and that trial counsel stated that he had filed a motion to recuse, which was denied.

Trial counsel testified that his interaction with the Petitioner throughout his representation was "[v]ery good." He met with the Petitioner "on an extremely regular basis." Additionally, trial counsel "saw problems with the State's case and ... wanted to work very hard to be able to get him out of this."

Trial counsel filed a motion for discovery and "a motion to inspect items seized by the TBI and by the sheriff's department." He stated,

> In addition to that what the facts appeared to be was that on the weekend of December the 14th—December the 14th, my understanding, was a Friday. Lucas had testing for his brown belt or green belt, some particular belt. And [the Petitioner] had him at the dojo that Friday. And then that Saturday and Sunday [the Petitioner] had gone over to Ms. Barger's home. And I can't tell you the town that's in. It's about 50 miles from here. And that's where he had spent the weekend. I went to Ms. Barger's home and drove over there. Drove back to the home on Grassland which is where [the victim] lived to get the mileage down. I even drove up this long gravel driveway and went up around behind the house. Nobody was there at that time. I got information that Ms. Barger was over in some other area. It's probably an hour from here. Ms. Young and I went to that other place and we drove a gravel road probably a quarter of a mile back off the road and then drove through a field because we could see a trailer back there. And when we pulled up to the trailer Ms. Barger and Mr. Pace were sitting on the front porch of that trailer. And I talked with them and interviewed them there. On several occasions I met with the folks around [the victim's] home. There was some folks that lived out on Florence Road maybe.... And there was a witness statement that talked about the weekend this happened they was missing some items out of their freezer.... I talked with [the victim's] next door neighbor. I talked with another gentleman that lives down the road from [the victim] that I think what his statement was that he had driven by that night and thought she was hanging some pictures on the wall. [The Petitioner] said I didn't watch his video with him. I simply do not agree with that. [Assistant trial counsel] went with me several times to the jail, but I went a lot to the jail by myself. And whenever I had videos to watch or when we were preparing [the Petitioner] for trial for his testimony the jail would give us—there's a little room right beside the telephone in booking.... Not always, but for the videos they would let us go in there.... Went through pictures with [the Petitioner].... Anytime I would come across something I would go out there to the jail and I would tell him about it and talk with him about it. I worked very hard.

Trial counsel filed a motion to inspect the crime scene but never entered the home because the house had new residents. He also filed a motion "regarding the extent of questions allowed of Detective Mayercik." He explained that the victim was in contact with a lady named Karla Teutsch from Louisiana via a social-networking website. Trial counsel considered her an "alternative suspect" because she had communicated with the victim as recently as the day of the murder. Detective Mayercik had learned about this communication through his investigation, and trial counsel wanted to learn the extent of Detective Mayercik's testimony. The State, however, ultimately did not call Detective Mayercik as a witness.

Trial counsel filed a motion "to determine the photographs that would be admitted into evidence." He explained that the victim was shot in the back of the head three times and that many pictures existed depicting the gruesome crime scene. He also filed a notice of alibi and thoroughly investigated the Petitioner's alibi that he was at Ms. Barger's home.

With regard to expert testimony preparation, trial counsel considered the firearms issue "significant" because the TBI report indicated that the victim was shot with a .32 caliber pistol. He wanted to request the opportunity to examine the composition of one of the lead bullets because the State had attested that the bullets must have been very old. However, trial counsel abandoned this theory because of the possibility that the results would be "very damaging evidence."

Trial counsel denied that the State introduced any evidence at trial of which he was unaware before the trial. He was familiar with all of the State's witnesses, and as far as his preparation, he testified, "And for every witness ... I had a folder on that witness. I have their statement that they made to the police. If there was a video I have gone through and outlined that by the time and different elements in there.... And I also prepare questions for those particular witnesses."

He agreed that his wife,[5] the custody attorney, had represented the Petitioner in an unrelated matter prior to his representation of the Petitioner. At the time, he believed it best not to call her as a witness because, although she considered the Petitioner a "very nice man," she also would be asked about the number of times the Petitioner called the victim and the fact that he brought her discovery after the victim died without informing her of the victim's death. Trial counsel further explained that he has a rule in which he provides as much information as possible and then allows his clients to make the ultimate decisions. Accordingly, regarding the decision to call the Petitioner's custody attorney as a witness, "the Petitioner would have been the one to make the decision, not [trial counsel]."

The State asked trial counsel when he first learned that the Petitioner was not satisfied with his representation. Trial counsel responded that it was after he had

---

[5]     Although it is unclear from the record, it appears that, at some point between the trial and post-conviction hearing, trial counsel and the custody attorney were married.

exhausted the state's appeals process. During the time that trial counsel was filing a writ of certiorari to the United States Supreme Court, the Petitioner told him "something to the effect of, 'I know you did everything you could for me .... But now it's time I'm going to have to start looking at my post conviction.' "He noted that the Petitioner also stated that trial counsel had "gone above and beyond what [he] had to do. Judge tied [his] hands."

Before trial counsel heard whether the United States Supreme Court granted certiorari, he received a letter from the Petitioner "that his sister had hired a lawyer and that the lawyer said it would go against the strategy that he was going to use against me on post conviction if I proceeded forward before the U.S. Supreme Court." Trial counsel responded by letter and affidavit to verify that the Petitioner wished to withdraw his petition for certiorari.

Trial counsel did not remember the issue arising regarding the potential conflict with the trial court until after trial. The State admitted into evidence several letters from the Petitioner expressing his thanks to trial counsel for his representation. Trial counsel stated that he met with every witness of which the Petitioner would make him aware. Prior to trial, trial counsel conducted a mock direct and cross-examination with the Petitioner in order to prepare him for trial.

Responding to the Petitioner's allegation that trial counsel did not review with him the video statements of witnesses, trial counsel stated, "We went through all of the discovery in this particular case."

On cross-examination, trial counsel denied that he should have appealed the Petitioner's case to a United States District Court before filing a writ of certiorari before the United States Supreme Court. Trial counsel maintained that the Petitioner did not wish to have his custody attorney testify because of her potentially negative testimony.

Although trial counsel did have an issue with the testimony at trial regarding the way the victim was shot, he did not seek out an expert as to "blood spatter." Trial counsel confirmed that he filed a motion to prevent jurors from asking questions of witnesses but that it was denied. He objected to the jurors' asking questions at some point before or during the trial. He did not agree that he failed to include this issue in the Petitioner's motion for new trial.

Post-conviction counsel called the Petitioner to testify again. The Petitioner insisted that he wanted trial counsel to call his custody attorney as a witness and never told trial counsel otherwise. He also reiterated that trial counsel brought his laptop to the jail to show the Petitioner photographs but never any videos. He agreed that assistant trial counsel completed a mock direct and cross-examination with him but denied that trial counsel was present. On cross-examination, the Petitioner could not identify portions of his trial testimony he would have changed had he received more preparation. The Petitioner testified,

You know, I'm going to say this. It might hurt me.... But I like [trial counsel]. [Trial counsel] did step out and go above and beyond after my trial. And he helped me with my son. And I can't give him enough thanks. I've got nothing but respect for [trial counsel] for what he did. But, you know, I believe that there is things [sic] that he could have done differently at my trial. He told me he had 40 pages of questions for the detective. And when we get up there the detective, every answer he had was I'm not an expert in that field. And the general got up and said, look, he should have asked the right person the right question. Well, the whole time he never asked the right person the right question. He saved all these questions for the detective and he was never allowed to ask the questions that he had on the paper.

The Petitioner stated that trial counsel informed him that trial counsel interned for the trial court and that the trial court's wife worked at Bob Parks Realty. Given that "the victim worked at a title company where she did closings for Bob Parks Realty," the Petitioner asked trial counsel to request that the trial court recuse itself.

*Reynolds II*, 2013 WL 1857112, at *25–29.

## III.   Issues Presented for Review

In his petition, Reynolds asserts he is entitled to relief on three grounds. First, he claims that the trial court "violated [his] Sixth Amendment right to present a complete defense by refusing testimony from and about an alternative suspect the trial court had already determined to be a material and necessary witness." (Doc. No. 1, PageID# 4.) Second, Reynolds argues that the evidence presented at trial was insufficient to support the jury's verdict. (*Id.* at PageID# 5.) Finally, Reynolds alleges that he "was denied the effective assistance of counsel at trial and on direct appeal" because trial counsel:[6]

1)   "failed to adequately conduct any meaningful pre-trial investigation;"

2)   "failed to interview potential witnesses that would have been favorable to the defense;"

---

[6]     Although Reynolds argues that he was denied the effective assistance of counsel on direct appeal, none of the theories of ineffective assistance he has presented concerns the performance of counsel on direct appeal. (*See* Doc. No. 1, PageID# 9.)

3) "failed to adequately communicate with [Reynolds] in preparation for trial;"

4) "failed to call, as a trial witness, the attorney who was representing [Reynolds] in certain child support issues" and who "had valuable information that would have supported [Reynolds];"

5) "failed to allow [Reynolds] to view the video recording of his statement to police prior to his testimony at trial" despite Reynolds's "repeated requests to view that evidence before deciding whether or not to testify;"

6) "never prepared, in any manner, [Reynolds] to testify at trial;"

7) "never allowed [Reynolds] to view video statements of witnesses that were available to him despite the request of [Reynolds];" and

8) "failed to file a motion for the [trial judge] to recuse [himself] [despite counsel's awareness] that the wife of the [t]rial [j]udge was a co-employee of members of the victim's family."

(*Id.* at PageID# 9.)

## IV. Legal Standard

Reynolds's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. AEDPA "dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citations and quotations omitted); *see also Hardy v. Cross*, 565 U.S. 65, 66 (2011); *Felkner v. Jackson*, 562 U.S. 594, 597 (2011). AEDPA "requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006) (quoting *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998)).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *see also Burt v. Titlow*, 571 U.S. 12, 16 (2013); *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The statute enforces the principle that "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 563 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)) (Stevens, J., concurring); *see also Woods v. Donald*, 125 S. Ct. 1372, 1376 (2015). AEDPA prevents federal "retrials" of matters decided by the state court and "ensure[s] that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (*Bell I*). Under its provisions, petitioners may not "us[e] federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 567 U.S. 37, 38 (2012); *see also White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (explaining that the Supreme Court, "time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court'") (quoting *Burt*, 571 U.S. at 16).

The statute provides for the review of state court decisions in § 2254(d), which states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In determining the content of "clearly established Federal law" under § 2254(d)(1), this Court may not rely on the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014); *Harris v. Stovall*, 212 F.3d 940, 943–44 (6th Cir. 2000). Only the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision" are "clearly established" law for the purpose of the AEDPA analysis. *Williams*, 529 U.S. at 412; *Greene v. Fisher*, 565 U.S. 34, 38 (2011); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Thus, the inquiry into the nature of "clearly established Federal law" is limited to an examination of the landscape of Supreme Court holdings as it would have appeared to the Tennessee state courts at the time that they adjudicated the petitioner's case on the merits. *Miller v. Stovall*, 742 F.3d 642, 644–45 (6th Cir. 2014) (citing *Green*, 565 U.S. at 38).

A federal habeas court may issue the writ under AEDPA's "contrary to" clause if the state court applies a rule different from the governing law set forth in United States Supreme Court decisions or if it decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. *Bell I*, 535 U.S. at 694 (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)).The Court may grant relief under the "unreasonable application" clause "if the state court identifies the correct governing legal rule from [United States Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. A federal habeas court may not find a state court adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411; *accord Bell I*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly

established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S. Ct. 1697, 1706–07 (2014) (quoting *Harrington*, 562 U.S. at 103). Finally, habeas relief is available under § 2254(d)(2) if the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented." However, "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing' evidence." *Davis v. Ayala*, 135 S. Ct. 2187, 2199–2200 (2015) (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006)); 28 U.S.C. § 2254(e)(1).

AEDPA also imposes a total exhaustion requirement, contained in 28 U.S.C. § 2254(b) and (c), which directs that "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State" or such remedies are no longer available. *Rhines v. Weber*, 544 U.S. 269, 274 (2005). With certain limited exceptions, to properly exhaust a claim under AEDPA, the petitioner must have raised the same claim on the same grounds before the state courts. *Pinholster*, 563 U.S. at 182; *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417) (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). "Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Lyons v. Stovall*, 188 F.3d 327, 331 (6th Cir. 1999). In Tennessee courts, a petitioner has exhausted all available state remedies when the TCCA has denied a claim of error. *Adams v. Holland*, 330 F.3d 398, 401 (6th Cir. 2003) (citing Tenn. Sup. Ct. R. 39).

"[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thomas*, 501 U.S. 722, 732 (1991). If the claims can no longer be considered by the state court because they are procedurally barred under state law, they are considered defaulted for purposes of federal review. A petitioner must "demonstrate cause for his state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

## V.    Analysis

Reynolds argues that, at trial, he was denied the right to present a complete defense and that his trial lawyer was constitutionally ineffective. He also claims that the evidence presented at trial was insufficient to support his conviction. (Doc. No. 1, PageID# 4–7.) Viewed through AEDPA's deferential lens, the TCCA's rejection of Reynolds's claims was consistent with clearly established law and based on a reasonable determination of the facts in light of the evidence presented. Reynolds is not entitled to relief on any of his claims.

### A.  The Right to Present a Complete Defense

States have "broad latitude" to "establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). "[W]ell established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326 (internal citations omitted). The Supreme Court, "plainly referring to rules of [that] type," has made clear that the Constitution allows trial judges "to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses

an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Id.* at 326–27 (quoting *Crane v. Kentucky*, 476 U.S. 683, 689–90).

Such exclusions may be found in rules that regulate "the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged." *Id.* at 327. When the proffered evidence "does not sufficiently connect the other person to the crime," it may be excluded. *Id.* (quoting 40A Am.Jur.2d, Homicide § 286, pp. 136–138 (1999)). Rules allowing exclusions of that nature "are widely accepted." *Id.*

However, the "broad latitude" that rulemakers enjoy must not usurp the rights of defendants: "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Id.* at 324 (quoting *Crane*, 476 U.S. at 690). That guarantee encompasses "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary," which is "a fundamental element of due process." *Washington v. Texas*, 388 U.S. 14, 18 (1967). Evidentiary rules that "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve" violate the accused's right to present a complete defense. *Holmes*, 547 U.S. at 324 (internal quotations and alterations omitted). However, "[o]nly rarely" has the Supreme Court held "that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013).

1. **The TCCA's rejection of Reynolds's right to present a complete defense claim was neither contrary to clearly established law nor an unreasonable application of it.**

Reynolds claims that "[t]he trial court violated [his] Sixth Amendment right to present a complete defense by rejecting testimony from and about an alternative suspect, Karla Teu[tsch],

previously declared by the trial court to be a material and necessary witness." (Doc. No. 1, PageID# 5.) In a cursory and ambiguous argument, Reynolds "incorporates by reference the federal predicate set forth in his Application for Permission to Appeal and Opinion of the Court of Criminal Appeals . . . as described in 2010 WL 5343305" and concludes that, "[f]or the foregoing reasons, . . . the Tennessee appellate courts utilized a standard of review that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court in *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.E.2d 503 (2006) . . . ." (Doc. No. 1, PageID# 5.) Whatever Reynolds intended to incorporate from those documents, neither provides him with the argument that is needed in the context of his habeas petition, which is an explanation of how the decision of the TCCA rejecting his complete defense claim was either contrary to or involved an unreasonable application of clearly established federal law under § 2254(d)(1).[7] Respondent argues that the TCCA's decision was just the opposite—the trial court rejected the testimony as irrelevant "after taking an offer of proof about the testimony" and, therefore, the TCCA's determination of this issue was [] not contrary to clearly established federal law . . . ." (Doc. No. 12, PageID# 77.)

The TCCA summarized and ruled on Reynolds's complete defense claim as follows:

The Defendant contends that the trial court violated his Sixth Amendment right to present a complete defense by refusing to allow him to present testimony from and about an alternative suspect, "Kenny," whom the trial court previously declared a material and necessary witness. The State counters that the trial court properly applied the Tennessee Rules of Evidence when it excluded this evidence.

In an offer of proof about "Kenny," Karla Teutsch testified she lived in Shreveport, Louisiana, and she communicated with the victim through a MySpace page she

---

[7] While one might think that Reynolds's application for permission to appeal the decision of the TCCA to the Tennessee Supreme Court might focus on the ways in which the TCCA erred, and thereby have some relevance to the AEDPA analysis, instead, Reynolds's complete defense argument in that application revolves entirely around the ways in which the trial court erred. (*See* Doc. No. 13-32, PageID# 3693–3700.)

created as a man named "Kenny" from Tennessee. Teutsch said she created a false account using the name "Kenny" and a photograph of a male in an attempt to talk to a girl with whom her boyfriend from Dickson, Tennessee, was having an affair. Teutsch added multiple people, including the victim, as "friends" of "Kenny" on the MySpace page to make the page look more realistic, rather than like a hoax website.

Teutsch said she did not, in reality, have her hunting license, but as "Kenny" she told the victim that she had been hunting. Also, the weekend that the victim was murdered, Teutsch was in Dickson, Tennessee, hunting with her boyfriend. She explained that she sat in the stand with him but did not have a gun.

After the victim's murder, Detective Mayercik contacted "Kenny" via MySpace and asked him to contact the police. Teutsch googled the detective and learned about the murder. She then emailed the detective and told him that she had created a false website under the name "Kenny" and gave him her phone number.

The trial court excluded this information as not relevant pursuant to Tennessee Rule of Evidence 401 and as misleading pursuant to Tennessee Rule of Evidence 403.

Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence. *State v. Flood*, 219 S.W.3d 307, 316–17 (Tenn.2007). Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony. *See Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn.2000). In *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the United States Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. at 19.

The right to offer testimony, however, is not absolute: "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence...." *Chambers*, 410 U.S. at 302. Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process. Id. So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do

not violate a defendant's right to present a defense. *Flood*, 219 S.W.3d at 317 (citations omitted). Because "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *Scheffer*, 523 U.S. at 308, "[a]n evidentiary ruling ordinarily does not rise to the level of a constitutional violation," *State v. Rice*, 184 S.W.3d 646, 673 (Tenn.2006).

It has long been recognized by the courts of this state that an accused is entitled to present evidence implicating others in the crime. *State v. Powers*, 101 S.W.3d 383, 394 (Tenn.2003) (citing *Sawyers v. State*, 83 Tenn. (15 Lea) 694, 695 (1885)). The Powers court instructed that the Rules of Evidence are adequate to determine whether such evidence is admissible. Id. In Tennessee, the determination of whether proffered evidence is relevant in accordance with Tennessee Rule of Evidence 402 is left to the sound discretion of the trial judge, as is the determination of whether the probative value of evidence is substantially outweighed by the possibility of prejudice pursuant to Tennessee Rule of Evidence 403. *State v. Kennedy*, 7 S.W.3d 58, 68 (Tenn.Crim.App.1999) (citing *State v. Forbes*, 918 S.W.2d 431, 449 (Tenn.Crim.App.1995); *State v. Burlison*, 868 S.W.2d 713, 720–21 (Tenn.Crim.App.1993)). In making these decisions, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial. *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn.Crim.App.1995). We will only disturb an evidentiary ruling on appeal when it appears that the trial court arbitrarily exercised its discretion. *State v. Baker*, 785 S.W.2d 132, 134 (Tenn.Crim.App.1989).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See Forbes*, 918 S.W.2d at 449 (quoting Tenn. R. Evid. 401). In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4–8 (4th ed.2000). After the trial court finds that the proffered evidence is relevant, it then weighs the probative value of that evidence against the risk that the evidence will unfairly prejudice the trier. *State v. James*, 81 S.W.3d 751, 757 (Tenn.2002). If the court finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403. " '[E]xcluding relevant evidence under [Tenn. R. Evid. 403] is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." James, 81 S.W.3d at 757–58 (quoting *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn.Ct.App.1999) (citations omitted)).

A defendant is entitled to present evidence implicating another in the crime only if the evidence is relevant under Tennessee Rule of Evidence 401 and the evidence is

not unfairly prejudicial as provided by Rule 403. Id. In a criminal case, evidence that a third party had the motive and opportunity to commit the offense certainly would be relevant. Powers, at 395. Even if the evidence meets the test of relevance, however, Tennessee Rule of Evidence 403 may still justify exclusion of such evidence. Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The evidence to establish that someone other than the defendant is the guilty party must be such evidence as would be relevant on the trial of the third party; and the evidence offered by the accused as to the commission of the crime by a third party must be limited to such facts as are inconsistent with the defendant's guilt, and to such facts as raise a reasonable inference or presumption as to the defendant's innocence. *Hensley v. State*, 28 Tenn. 243 (1848). To be admissible, the evidence must be such proof that directly connects the third party with the substance of the crime, and tends to clearly point out someone besides the accused as the guilty person. *State v. Algeron Cross*, No. M2004–01930–CCA–R3CD, 2005 WL 1252631, at *9 (Tenn.Crim.App., at Nashville, May 25, 2005), *perm. app. denied* (Tenn. Dec. 5, 2005). Evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible. *Id*. (citing 22A C.J.S. Criminal Law § 729 (1989)).

In the case under submission, we conclude that the trial court did not abuse its discretion when it determined that the evidence that Teutsch communicated with the victim via a hoax MySpace page and was in Dickson on the weekend of the victim's murder was not relevant. Teutsch clearly explained the reason she created the MySpace page, and her communications with the victim were benign. The two had never met and never agreed to meet. There was no indication that Teutsch, coincidentally visiting Tennessee the weekend of the murder, had any idea where the victim lived or had ever been to her house. Further, there was no indication that Teutsch had any animosity toward the victim or any motive for harming the victim or any opportunity to do so. The fact that Detective Mayercik had an alternative suspect named "Kenny," who he later determined was not the murderer, was presented to the jury. The trial court did not abuse its discretion when it determined that the further details about "Kenny," presented through Teutsch were not relevant to the victim's murder. The Defendant is not entitled to relief on this issue.

*Reynolds I*, 2010 WL 5343305, at *28–31.

The TCCA did not "appl[y] a rule that contradicts the governing law" set out by Supreme Court precedent for complete defense claims. *Williams*, 529 U.S. at 405. Before analyzing Reynolds's claim, the TCCA acknowledged that a criminal defendant's right to present his own witnesses "is a fundamental element of due process of law," but also that the right is not absolute.

*Reynolds I*, 2010 WL 5343305 (quoting *Washington*, 388 U.S. at 19). The TCCA then correctly laid out the rule in *Holmes* that governs Reynolds's claim: "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Reynolds I*, 2010 WL 5343305, at *29. Thus, the rule that the TCCA applied was not "contrary to" clearly established federal law. 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 405.

Nor did the TCCA "confront[] a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrive[] at a result different from [its] precedent." *Williams*, 529 U.S. at 406. Reynolds suggests otherwise when he claims that "the trial court committed almost the exact same error that was committed in *Holmes v. South Carolina* . . . ." (Doc. No. 22.) In that case, to demonstrate that he was innocent of the charges of murder, burglary, and robbery, Holmes "sought to introduce proof that another man, Jimmy McCaw White, had attacked [the victim]." *Holmes*, 547 U.S. at 323. That proof was undeniably exculpatory: "several witnesses . . . placed White in the victim's neighborhood on the morning of the assault" and "four other witnesses . . . testified that White had either acknowledged that [Holmes] was 'innocent' or had actually admitted to committing the crimes." *Id.* Affirming the trial court's exclusion of that third-party evidence, the South Carolina Supreme Court held that, "where there is strong evidence of an appellant's guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the appellant's own innocence." *Id.* at 324.

The *Holmes* court found that the rule applied by the South Carolina Supreme Court did not "rationally serve" the end that it was designed to promote, which was "to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central

issues." *Id.* at 330. That was because the South Carolina rule instructed courts to focus on the strength of the prosecution's evidence against the accused, which allowed them to condemn proffered evidence as "weak" without even weighing it: "The point is that, by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or case doubt." *Id.* at 331.

Reynolds's case is readily distinguishable from *Holmes*. Unlike the testimony that Holmes sought to introduce, Teutsch's testimony does not "squarely prove[]" that she, rather than Reynolds, was the perpetrator. *Id.* at 330. Far from it. As the TCCA rightly points out, there was no indication that Teutsch knew where Reynolds lived or had any motive to kill her, and her "communications with the victim were benign." *Reynolds I*, 2010 WL 5343305, at *31. Further, in rejecting Teutsch's testimony as irrelevant, the TCCA did not rely on, or even mention, the strength of the prosecution's evidence against Reynolds.[8] *Id.* Thus, the TCCA's decision was not "contrary to" the Supreme Court's holding in *Holmes*.

---

[8]    Reynolds argues that, "[l]ike in *Holmes*, [w]hen the trial court refused to allow 'Kenny' to testify before the jury, it simply assessed that the strength of the prosecutions' case was too strong and that the third-party evidence would 'confuse or mislead' the jury." (Doc. No. 22, PageID# 4080–81.) Yet the trial judge did not even mention the prosecution's case in finding that Teutsch's testimony was irrelevant:

> First of all in regard to [Teutsch] there are a couple of things I'm to look at. One, the definition of relevant evidence. This is under Rule 401. Relevant evidence means evidence having any tendency to make the existence of any fact that is [of] consequence to the determination of the action more probable or less probable than it would be without the evidence. I'm going to find first of all that this is not relevant evidence. There is absolutely no evidence of any animosity between these parties that would give rise to a motive to kill the victim. The second thing I'm to look at under this Powers case is opportunity. There has been no proof whatsoever submitted by the defense that this lady had any opportunity or was in the location where this killing took place. . . . . And even if by some stretch it was relevant, under 403 if this information was introduced I believe it should be excluded because its probative value is substantially outweighed by the danger of unfair prejudice,

Reynolds also argues that the TCCA's decision was an unreasonable application of the rule in *Holmes* or *Washington*. (Doc. No. 22, PageID# 4077.) In *Holmes*, the Court noted that its "cases contain several illustrations of 'arbitrary rules,' *i.e.*, rules that excluded important defense evidence but that did not serve any legitimate interests." *Holmes*, 547 U.S. at 325. *Washington v. Texas* was one such case. *Id.* At issue in *Washington* was a Texas procedural statute that prevented "persons charged as principals, accomplices, or accessories in the same crime [from being] introduced as witnesses for each other." *Washington*, 388 U.S. at 14. Application of that statute meant that Washington, who had been convicted of murder, was unable to introduce the testimony of Charles Fuller, which would have revealed that Fuller, not Washington, had fired the shot that killed the victim. *Id.* at 15. Unsurprisingly, it was "undisputed that Fuller's testimony would have been relevant and material, and that it was vital to the defense." *Id.* The Court held that Washington's right to offer the testimony of witnesses had been violated because "the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Id.* at 23.

Reynolds concedes that "the facts in *Washington* are not identical to those in [his case]," but he claims that, nonetheless, the "*Washington* reasoning should apply . . . [because] Mr. Reynolds was denied due process of law when the trial court prevented him from presenting testimony from an alternative suspect previously certified by the trial court to be a material and necessary witness." (Doc. No. 22, PageID# 4077.) Reynolds has not argued that Tennessee Rule

---

confusion of issues or misleading the jury or by a consideration of undue delay, waste of time or a needless presentation of cumulative evidence.

(Doc. No. 13-19, PageID# 2463–64.)

of Evidence 401, which allowed Teutsch's testimony to be excluded as irrelevant, serves no "legitimate interests." *Holmes*, 547 U.S. at 325; *Reynolds I*, 2010 WL 5343305, at *29. Rather, Reynolds argues that the trial court's determination that Teutsch was a material and necessary witness "obviated . . . [the] relevancy analysis," and, even if it had not, Teutsch's testimony was relevant and material to Reynolds's defense: "it is this undeniable fact – that proof of Ms. Teutsch's highly suspect activities just before the murder would cast doubt on [Reynolds's] guilt – that makes the conviction illegal under the rule of both *Holmes* and *Washington*." (Doc. No. 22, PageID# 4078.) Finally, Reynolds argues that, even if the trial court was right to exclude Teutsch's testimony, Reynolds should at least "have been allowed to ask questions to the investigators about why they considered 'Kenny' to be a viable suspect in the first place and how they ruled her out; for example, evidence of phone records, MySpace information, recorded telephone calls, and questions asked by a detective as a part of his investigation should have been allowed to protect Mr. Reynolds's right to present a complete defense." (*Id.* at PageID# 4080.)

The TCCA's rejection of Reynolds's complete defense claim was not an objectively unreasonable application of either *Holmes* or *Washington*. In each of those cases, the indisputably exculpatory nature of the rejected testimony was central to the Court's conclusion that the right to present a complete defense had been violated. Because it was reasonable for the TCCA to uphold the trial court's finding that Teutsch's testimony was not relevant to Reynolds's defense, neither precedent mandates the relief that he requests. A fuller explanation of the reasonableness of the TCCA's finding that Teutsch's testimony was irrelevant comes in the next section, which responds to Reynolds's argument that the TCCA's rejection of his complete defense claim was based on an unreasonable determination of the facts in light of the evidence presented.

## 2. The TCCA's rejection of Reynolds's right to present a complete defense claim was not based on an unreasonable determination of the facts.

Reynolds argues that the TCCA's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding" without clearly explaining how. (Doc. No. 1, PageID# 7.) However, the essence of his claim is that Teutsch's testimony was "by all means relevant to his defense" and, therefore, the TCCA's decision affirming the trial court's conclusion that Teutsch did not have the opportunity or motive to murder the victim was based on an unreasonable determination of the facts in light of the evidence presented.[9] (Doc. No. 22, PageID# 2243.) A review of the record does not support Reynolds's position.

Reynolds's first claim is that the trial court's holding, after a pre-trial hearing, that Teutsch was a material and necessary witness automatically rendered her testimony relevant to his defense. (Doc. No. 22, PageID# 4075.) Reynolds sought to have Teutsch, who lived out of state, declared a material witness so that he could subpoena her and thereby secure her testimony.[10] (Doc. No.

---

[9]      In his reply, Reynolds at times suggests that he intended to present evidence pertaining to suspects other than Teutsch. (Doc. No. 22, PageID# 4081, 4083.) However, in a pre-trial hearing on Reynolds's motion to determine the extent to which he would be able to question Detective Mayercik regarding his investigation into the victim's murder, Reynolds's counsel clarified that his cross-examination of Mayercik would concern "[o]ne person," namely, Teutsch. (Doc. No. 13-8, PageID# 754–55.) The decision to exclude Teutsch's testimony as irrelevant is therefore the focus of the Court's analysis.

[10]      Tennessee Code Annotated § 40-17-207 provides:

If a person in any state, which by its laws has made provision for commanding persons within its borders to attend and testify in criminal prosecutions, or grand jury investigations commenced or about to commence in this state, is a material witness in a prosecution pending in a court of record in this state, or in a grand jury investigation which has commenced or is about to commence, a judge of the court may issue a certificate under the seal of the court stating these facts and specifying the number of days the witness will be required. The certificate may include a recommendation that the witness be taken into immediate custody and delivered to

13-11, PageID# 858:13–14.) Although the prosecutor expressed concern that Teutsch was "totally irrelevant to the case," he did not object out of fear that refusing to allow Reynolds to develop the Teutsch evidence "might lead to error." (*Id.* at PageID# 859:4–8.) The trial judge decided to allow Teutsch to be labeled a material witness, but held that he would make a "determination about relevance somewhere later down the road." (*Id.* at PageID# 859:19–20.) Thus, Reynolds's suggestion that the trial court's material witness ruling "obviated the need to revisit a relevancy analysis" is at odds with the record. (Doc. No. 22, PageID# 4075.)

Alternatively, Reynolds argues that Teutsch's testimony was relevant independent of the trial court's material witness ruling, claiming that Teutsch had both an opportunity and a motive to murder the victim:

> [I]n his offer of proof, Mr. Reynolds showed that 'Kenny,' who was really Ms. Teutsch posing to be a man, just happened to be up in the Nashville area from Shreveport, Louisiana, on the same night Decedent was murdered. . . . The bizarre questions on My Space and the fact that 'Kenny' discussed meeting up with Decedent and suddenly stopped talking to her right before Decedent's death, among other things, indicates a possible motive for the killing.

(*Id.* at PageID# 4083–84.)

The TCCA's rejection of that argument was not based on an unreasonable determination of the facts in light of the evidence presented. The TCCA affirmed the trial court's ruling that Teutsch did not have an opportunity to commit the murder by emphasizing that she and the victim "had never agreed to meet," and that "[t]here was no indication that Teutsch, coincidentally visiting Tennessee the weekend of the murder, had any idea where the victim lived or had ever been to her

---

an officer of this state to assure the witness' attendance in this state. This certificate shall be presented to a judge of a court of record in the county in which the witness is found.

Tenn. Code Ann. § 40-17-207.

house." *Reynolds I*, 2010 WL 5343305, at *31. A review of the record supports the TCCA's conclusion. The victim had twice suggested via MySpace that she and Teutsch meet up. On December 11, 2007, the victim wrote: "After the holidays are over how would you feel about maybe meeting sometime for a gingeretto???" (Doc. No. 13-28, PageID#3434.) Because Teutsch did not respond, the victim sent a follow-up message on December 13, 2007: "Hey . . . I didn't freak you out or offend you with my last email did I? I hope not. You seem like a nice guy and we have some things in common . . . so I thought it would be nice to meet sometime if you would like to also." (*Id.* at PageID# 3435.) When Teutsch was asked why she never responded to the victim's overtures, she stated: "Because I didn't know how to tell her the truth I suppose." (Doc. No. 13-19, PageID# 2460.) There is no evidence in the record to suggest that the victim and Teutsch had ever agreed to meet, and Teutsch testified that they had never done so. (*Id.* at PageID# 2429:10.)

Nor is there any evidence that Teutsch knew where the victim lived, or that she was in Murfreesboro on the night that the victim was killed. Although, in one MySpace message, the victim asked Teutsch if she "ever make[s] it to the M'boro area?", the victim did not provide any indication of where within that area she might live, or even that she lived there. (Doc. No. 13-28, PageID# 3418.) Teutsch did not respond to that question. (*Id.*)

The only evidence that supports Reynolds's position that Teutsch had the opportunity to murder the victim was a "series of [cell phone] charges on Saturday, December 15th, [the night of the murder,] from 11:56 A.M. through 10:41 P.M. in Nashville." (Doc. No. 13-19, PageID# 2447.) In response to questions about those charges, Teutsch explained that she might have gone "into town" "to Opry Mills mal[l]," but she could not say for certain because she had "been up [to Tennessee] every other weekend for the past seven years" (Doc. No. 13-19, PageID# 2447–48) to visit her boyfriend. (*Id.* at PageID# 2420–21.) All that the cell phone charges establish is that

Teutsch's phone was somewhere in the Nashville area on the night that the victim was murdered. The TCCA's conclusion that Teutsch did not have an opportunity to commit the murder was not based on an unreasonable determination of the facts.

In finding no evidence that Teutsch had a motive to kill the victim, the TCCA rightly emphasized that Teutsch "clearly explained the reason she created the MySpace page, [] her communications with the victim were benign," and that "there was no indication that Teutsch had any animosity toward the victim or any motive for harming [her] . . . ." *Reynolds I*, 2010 WL 5343305, at *31. Teutsch testified that she knew her boyfriend had cheated on her with a receptionist who lived somewhere near Murfreesboro and that, "to contact her to find out some information[,] [she] created [the] MySpace page." (Doc. No. 13-19, PageID# 2420:22–25, 2422:3–4.) "[T]o make the MySpace page feasible and not just some hoax," she "needed to have friends on the page." (*Id.* at PageID# 2423.) Teutsch therefore "contacted and was contacted by several females in the area of where [she] believed [the] receptionist lived," one of which was the victim. (Doc. No. 13-28, PageID# 3355.) Teutsch explained that she and the victim "mainly exchanged recipes and [the victim] vented about her ex-husband on a limited basis." (Doc. 13-19, PageID# 2440.) A review of their MySpace correspondence confirms that. (Doc. No. 13-28, PageID# 3363–64, 3368–71, PageID# 3376–78, 3393–94.) They also discussed hunting, horseback riding, and football. (*Id.* at PageID# 3373, 3388.) When Teutsch was pressed to explain why she continued to correspond with the victim after Teutsch had determined that her boyfriend had stopped cheating on her, Teutsch said, "[b]ecause the page was still there."(Doc. No. 13-19, PageID# 2453.) Reynolds points to "[t]he bizarre questions on [Teutsch's] MySpace" page as providing a "possible motive for the killing." (Doc. No. 22,PageID# 4084.) Some of those questions were macabre: the sixth question was "Have you ever seen a corpse?" and the nineteenth was "If I only had one day

to live what would we do together?" (Doc. No. 13-19, PageID# 2427.) Trial counsel repeatedly asked Teutsch why she asked the victim such questions. (*Id.* at PageID# 2425:21–23, 2427:21, 2430:4, 2431:4–6, 2433:1–2.) Teutsch explained:

> Like I said, I didn't ask the question. The question was posted on my page. You can post things on MySpace that you get from other people, other people's posts. You post them. You answer the questions. And then someone else can respond to your post or they can post it themselves on their own page.

(*Id.* at PageID# 2427–28.) Teutsch did not direct the questions at the victim or, for that matter, at "anyone in particular." (*Id.* at PageID# 2430:8–10.) Instead, as the trial judge explained to Reynolds's trial counsel in exasperation: "She's said several times she didn't do the questions. She judge copied them off somebody else's website." (Doc. No. 13-19, PageID# 2433:5–7.) The questions do not support the inference that Teutsch wanted to kill the victim; instead, they are consistent with prior testimony that she was simply trying to create a MySpace page that did not look like a sham. The TCCA's conclusion that Teutsch did not have a motive to kill the victim was not based on an unreasonable determination of the facts in light of the evidence presented.

### B. The Sufficiency of the Evidence

To prevail on a claim of insufficient evidence, a petitioner must show that, when the evidence is viewed "in the light most favorable to the prosecution," no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S at 319. This deferential standard preserves the role of the trier of fact as the entity that resolves "conflicts in the testimony," "weigh[s] the evidence," and "draw[s] reasonable inferences from basic facts to ultimate facts." *Id.* "[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). AEDPA adds an extra layer of deference to a jury's finding of guilt: "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court

disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012).

### 1. The TCCA's rejection of Reynolds's sufficiency of the evidence claim was neither contrary to clearly established law nor an unreasonable application of it.

Reynolds argues that the evidence in the trial record was insufficient to support his conviction for three reasons.[11] First, citing Tennessee Code Annotated § 39-13-202(a)(1), Reynolds argues that premeditation requires "judgment and reflection" and there was "little, if any, evidence which would go to show [his] state of mind." (Doc. No. 1, PageID# 6.) Second, Reynolds argues that Tanner Long's testimony provided him with an alibi—Long "testified that [Reynolds] was asleep on the couch in the home of Ms. Eve Barger while Mr. Long was on the computer late on the evening Ms. Atkin was murdered." (*Id.*) Further, "[t]he time frame nailed down by all witnesses would leave a very small window of time and make it extremely difficult for someone in [Reynolds's] location to drive to the crime scene and return unnoticed as was the situation here because Ms. Barger did not hear anyone on the gravel driveway." (*Id.* at PageID# 7.) Finally, Reynolds points out that there was no forensic evidence that he "was at Ms. Atkin's house or even in the vicinity of Ms. Atkin's home on the day of her murder," and the "murder weapon has not been produced by the State." (*Id.*) Reynolds argues that, by finding that the evidence was sufficient to support his conviction, the TCCA "utilized a standard of review that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court in *Jackson v. Virginia* . . . and *Coleman v. Johnson*, [566 U.S. 650 (2012)] and/or

---

11      Reynolds again incorporates "by reference the federal predicate set forth in his Application for Permission to Appeal and Opinion of the Court of Criminal appeals . . . ." (Doc. No. 1, PageID# 6.) It is worth noting that Reynolds did not raise an insufficient evidence claim in his application for permission to appeal and therefore that application cannot be the object of any meaningful incorporation for this claim. (*See* Doc. No. 13-32, PageID# 3683–84.)

[produced a] decision that was based on an unreasonable determination of the facts in light of the evidence presented . . . ." (Doc. No. 1, PageID# 7.)

In response, Respondent argues that, "[f]or the reasons set forth in its opinion, the [TCCA's] determination was neither contrary to clearly established federal law nor unreasonable." (Doc. No. 12, PageID# 81.) Respondent notes that the TCCA properly identified the rule from *Jackson v. Virginia* as governing Reynolds's claim, but then only responds to the first basis upon which Reynolds attacks the sufficiency of the evidence, arguing that the TCCA "found several factors that demonstrated the existence of premeditation . . . ." (*Id.*)

The TCCA analyzed Reynolds's sufficiency of the evidence claim as follows:

> The Defendant contends that the evidence is insufficient to sustain his conviction because there was insufficient evidence that he acted with premeditation when he committed this murder and because Long testified that the Defendant was at Barger's house asleep during the time of the murder. Also, the Defendant notes that there is no evidence that he was at, or in the vicinity of, the victim's home around the time of the murder. The State counters that there was sufficient evidence presented to support his conviction.

> When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see* Tenn. R.App. P. 13(e), *State v. Goodwin,* 143 S.W.3d 771, 775 (Tenn.2004) (citing *State v. Reid,* 91 S.W.3d 247, 276 (Tenn.2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass,* 13 S.W.3d 389, 392–93 (Tenn.Crim.App.1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith,* 868 S.W.2d 561, 569 (Tenn.1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice,* 184 S.W.3d 646, 662 (Tenn.2006) (citations omitted).

> In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews,* 805 S.W.2d 776, 779

(Tenn.Crim.App.1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs,* 995 S.W.2d 102, 105 (Tenn.1999); *Liakas v. State,* 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn.1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn.1997); *Liakas,* 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978); *State v. Grace,* 493 S.W.2d 474, 479 (Tenn.1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State,* 219 Tenn. 4, 405 S.W.2d 768, 771 (Tenn.1996) (citing *Carroll v. State,* 212 Tenn. 464, 370 S.W.2d 523 (Tenn.1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin,* 143 S.W.3d at 775 (citing *State v. Smith,* 24 S.W.3d 274, 279 (Tenn.2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers,* 35 S.W.3d 516, 557–58 (Tenn.2000).

In this case, the Defendant was convicted of first degree premeditated murder, a Class A felony. First degree murder is defined as a "premeditated and intentional killing of another." T .C.A. § 39–13–202(a)(1) (2001). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39–13–202(d) (2001). Whether the defendant premeditated is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland,* 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39–13–202(d). The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland,* 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant

prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols,* 24 S.W.3d 297, 302 (Tenn.2000); *State v. Halake,* 102 S.W.3d 661, 668 (Tenn.Crim.App.2001) (citing *State v. Gentry,* 881 S.W.2d 1, 4–5 (Tenn.Crim.App.1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach,* 148 S.W.3d 42, 54 (Tenn.2004).

The evidence, considered in the light most favorable to the State, proves that the Defendant, who was at the time involved in a highly contested custody dispute with the victim, took his two sons to the home of his girlfriend, Barger, on December 15, 2007. The Defendant and the victim had been in a dispute about their son Lucas's birthday party, which the victim planned to be held that weekend, which was the Defendant's weekend to have Lucas. After arriving at Barger's house, the Defendant and his two sons went hiking with one of his older son's friends and then returned to Barger's home, where the Defendant cooked dinner and then watched television with Barger and his two sons. Barger went to bed at around 11:00 p.m. At some point thereafter, the Defendant entered Barger's room and asked her to listen for Lucas, which she did. Lucas awoke at 4:30 a.m. and Barger attempted unsuccessfully to phone the Defendant, whose phone was turned off. The Defendant returned early in the morning and went into Barger's room where she and Lucas were lying in bed watching television. According to Barger, the Defendant got into bed and confessed that he had killed the victim. By all accounts, the day after the murder was a "normal" day during which the Defendant ate pancakes, watched television, and played with his sons. The Defendant burned some trash in a barrel at Barger's request.

The circumstantial evidence against the Defendant included that he was wearing Wrangler jeans on the night of the murder and that pieces of Wrangler denim were found in the burn barrel. The Defendant's contention, apparently rejected by the jury, was that the Wrangler denim in the burn barrel was from a purse that Barger owned rather than from his jeans. Police also learned that the victim was shot by a .32 pistol firing distinctive bullets that were last manufactured before 1977. The type of gun that could have fired these bullets included a Llama. Evidence from the scene also indicated that the gun may have misfired, firing two bullets at one time. Police found in Barger's car two bullets matching the ones found at the crime scene. Barger reported that she was missing a gun from a gun bag that she took from her husband after their divorce. Barger's ex-husband confirmed that the gun bag contained a Llama, that sometimes misfired, and that the bag also contained bullets for the gun that were manufactured before 1977. The police also found muddy footprints inside the victim's home that they believed belonged to the murderer.

In recorded conversations after this murder occurred, Barger mentioned several times that she wished the Defendant had never "told her" and that she did not hate him but that she wanted to know now, statements to which the Defendant never responded. The Defendant expressed his concern that the police were listening to their conversations and about his ability to trust Barger. The Defendant said he was

sorry for involving Barger in the situation and said he wished she had not told the police that one of her guns was missing. He also said he would tell the "whole truth" if the police attempted to implicate Barger, and that the he and Barger both knew "the whole truth." At one point, Barger said, "Why didn't you talk to me things could have been so much different" to which the Defendant responded, "I know."

Regarding the Defendant's assertions concerning the lack of physical evidence that he was present in the victim's home when she was murdered, we first note that such evidence is not necessary. The State presented direct evidence against the Defendant, namely Barger's testimony and their recorded conversations, that implicated him as the murderer. The State also presented circumstantial evidence that he murdered the victim: his motive; his access to the gun and the distinctive bullets found in the victim's home; his access to Barger's car where bullets matching those used to kill the victim were found; the burned portion of Wrangler denim in the burn barrel the Defendant used to burn trash; and the mud in Barger's car, given the muddy footprints found in the victim's home. The Defendant offered an alibi witness, Long, who testified that the Defendant was at Barger's house most of the night, but the jury rejected Long's testimony. Such action by the jury is within its providence. *Bland,* 958 S.W.2d at 659.

The Defendant also argues that the evidence was insufficient to prove premeditation. The first degree murder statute states, "The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." T.C.A. § 39–13–202(d). The question of whether a defendant has acted with premeditation is a jury question. *State v. Suttles,* 30 S.W.3d 252, 261 (Tenn.2000); *State v. Holder,* 15 S.W.3d 905, 914 (Tenn.Crim.App.1999).

In this case, there exist several of the factors accepted as actions that demonstrate the existence of premeditation. First, the Defendant was calm shortly after the killing. *See Bland,* 958 S.W.2d at 660. He returned to Barger's house, lay in bed and told her that he had killed the victim and then went to sleep, only to awake a short time later, eat breakfast, and engage in "normal" daily activities. Second, the victim in this case was unarmed and shot repeatedly in the back of her head. *Id.* Finally, the Defendant clearly had a motive for killing the victim in that the two were involved in a highly contested custody dispute and the Defendant admittedly "hated" the victim, and felt the victim was taking his son away from him. *See Leach,* 148 S.W.3d at 54. Accordingly, we conclude that the evidence is sufficient for the jury to find that the Defendant acted with premeditation and to find him guilty of first degree murder beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

*Reynolds I*, 2010 WL 5343305, at \*25–28.

The TCCA's rejection of Reynolds's insufficient evidence claim was not contrary to clearly established law. The TCCA correctly identified *Jackson v. Virginia* as governing resolution of Reynolds's claim. *Reynolds I*, 2010 WL 5343305, at *25. Reynolds does not specify the relevance of *Coleman v. Johnson* to his case but, regardless of what it might be, the TCCA cannot be faulted for failing to engage with *Coleman*, as that decision issued two years after the TCCA ruled on Reynolds's claim. The AEDPA analysis is limited to the landscape of Supreme Court precedent as it would have appeared at the time of the state court's decision. *Miller*, 742 F.3d at 644–45. Finally, Reynolds does not argue that the TCCA "confront[ed] a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrive[d] at a result different from [its] precedent." The TCCA's decision cannot be contrary to clearly established law on that basis. *Williams*, 529 U.S. at 406.

The TCCA properly applied *Jackson v. Virginia* to reject each of Reynolds's theories of insufficient evidence. With respect to premeditation, the TCCA stated that "there exist several of the factors that demonstrate [its] existence," such as Reynolds's calmness after the killing, the fact that the victim was unarmed and shot repeatedly in the back of the head, and the history of conflict and enmity between Reynolds and the victim, which could give rise to a motive to kill. *Reynolds I*, 2010 WL 5343305, at *28. This was a reasonable application of *Jackson v. Virginia*. *See Graves v. Settles*, No. 17-6235, 2018 WL 1891260, at *3 (6th Cir. Mar. 26, 2018) (concluding that the petitioner's "calmness after the killing," along with other factors, supported the Tennessee jury's finding of premeditated murder); *Houston v. Dutton*, 50 F.3d 381 (6th Cir. 1995) (holding that, among other factors, the victim's unarmed status, the point-blank nature of the victim's shooting, and the petitioner's calmness as he walked away from the victim all supported the Tennessee jury's finding that the petitioner premeditated the victim's murder).

The TCCA also reasonably rejected Reynolds's argument that Long's testimony that Reynolds was at Barger's house most of the night should have precluded a finding of guilt. The TCCA noted that "the jury rejected Long's testimony," which was a choice within its province as the finder of fact.[12] *Reynolds I*, 2010 WL 5343305, at *28. Further, Barger's testimony that, the morning after the murder, Reynolds "got into bed and confessed that he had killed the victim" supported the jury's verdict. *Id.* at *27. The jury's assessment of the credibility of witnesses is generally beyond the scope of review under *Jackson*; the TCCA's rejection of this theory of the insufficiency of the evidence was not objectively unreasonable. *Schlup*, 513 U.S. at 330.

Finally, the TCCA reasonably concluded that "physical evidence that [Reynolds] was present in the victim's home when she was murdered" was not necessary to support the jury's finding of guilt. *Reynolds I*, 2010 WL 5343305, at *28. Together, direct evidence (Barger's testimony and her recorded conversations with Reynolds) and circumstantial evidence (his motive to kill, access to a distinctive gun that could have been the murder weapon, access to Barger's car, where bullets that matched those used to kill the victim were found, the burnt denim in the barrel, and the mud in Barger's car) provided a strong foundation for the jury's verdict. *See United States v. Magallanez*, 408 F.3d 672, 681 (10th Cir. 2005) (explaining that the petitioner was "mistaken to believe that physical evidence is necessary to sustain a verdict"); *Olson v. Little*, Civil Action No. 09-361-KSF, 2012 WL 2970488, at *5 (E.D. Ky. Jan. 5, 2012) (rejecting petitioner's

---

[12]     Although the TCCA did not directly address the argument that Reynolds presses here regarding the difficulty of driving to the victim's home to commit the murder in the time frame "nailed down by all witnesses," the TCCA's choice to reject Long's testimony that Reynolds was at Barger's place "most of the night" can be construed as a choice to reject Reynolds's effort to characterize the "window of time" to commit the murder as "very small." (Doc. No. 1, PageID# 7.) However, even if the jury had credited Long's testimony, it could have concluded that Reynolds drove to the victim's house to commit the murder—Reynolds has not argued that it was impossible to make the drive in time, only that it would have been "extremely difficult." (*Id.*)

insufficiency claim on habeas review, noting that she had not cited "any cases for the proposition that physical evidence or eyewitness testimony is necessary to sustain a conviction"); *Brito v. Brown*, No. 09 Civ. 5754 (JGK), 2011 WL 1542516, at *4 (S.D.N.Y. Apr. 21, 2011) (holding that petitioner's conviction of two counts of murder could be sustained by witness testimony—which in this case included testimony that petitioner had "admitted to shooting the victims"—and therefore "corroborating physical evidence" was not necessary).

**2. The TCCA's rejection of Reynolds's sufficiency of the evidence claim was not based on an unreasonable determination of the facts.**

Reynolds asserts that the TCCA's rejection of his sufficiency of the evidence claim "was based on an unreasonable determination of the facts in light of the evidence presented," but he does not provide a single example of a factual error that the TCCA's decision relied upon. (Doc. No. 1, PageID# 7.) Instead, Reynolds argues that the evidence that the TCCA cited to uphold the jury's verdict was insufficient, as a matter of law, to support his conviction. (*See id.* at PageID# 6–7.) That argument is without merit for the reasons discussed above. Although the TCCA's sufficiency review involved an analysis of the jury's factual determinations, there is no indication that, in undertaking that analysis, the TCCA improperly recited or unreasonably determined the factual record of the trial. *See Gipson v. Sheldon*, 659 F. App'x 871, 881–82 (6th Cir. 2016) (involving a state court decision that "mistakenly stated that [a witness] identified [defendant] rather than Ricks as the individual who came to [witness's] home). The TCCA's rejection of Reynolds's insufficient evidence claim was not based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

### C. Ineffective Assistance of Counsel

*Strickland v. Washington*, 466 U.S. 668 (1984), sets a two-part test to evaluate whether counsel has been constitutionally ineffective. A petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness and (2) that, but for counsel's deficient representation, "the result of the proceeding would have been different." *Strickland*, 66 U.S. at 688–89, 694. The *Strickland* standard itself sets a high bar that is not easily surmounted by habeas petitioners. *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (alteration in original) (quoting *Strickland*, 466 U.S. at 690).

"The Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA; it requires the petitioner not only to demonstrate the merit of his underlying *Strickland* claim, but also to demonstrate that 'there is no possibility fairminded jurists could disagree that the state court's decision [rejecting the *Strickland* claim] conflicts with [Supreme Court] precedents." *Jackson v. Houk*, 687 F.3d 723, 740 (6th Cir. 2012) (citing *Harrington*, 562 U.S. at 102). Where a state court correctly identifies *Strickland* as the controlling precedent and applies it in evaluating a petitioner's claims, this Court applies a doubly deferential standard in its review. *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 848 (6th Cir. 2017). The Court must ask "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" and, if so, deny relief. *Id.* (quoting *Harrington*, 562 U.S. at 89). "The pivotal question," therefore, is not whether this Court would find counsel's performance deficient, but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101.

Even where counsel's performance was found constitutionally unreasonable, the petitioner is not entitled to relief if counsel's error had no effect on the judgment. *Strickland*, 466 U.S. at 691. To establish the necessary prejudice, the petitioner must prove that, absent counsel's deficient performance, there is a "reasonable probability" that the result of the trial would have been different. *Id.* at 694. A court need not analyze both *Strickland* elements "if the defendant makes an insufficient showing on one"—"[i]n particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of one of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

Reynolds claims he is entitled to habeas relief with respect to his ineffective assistance of counsel claim on all three bases available under 28 U.S.C. § 2254(d). First, he argues that "the [post-conviction trial court and the TCCA's] findings and rulings were contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" in the following cases: *Padilla v. Kentucky*, 559 U.S. 356 (2010), *United States v. Ruiz*, 536 U.S. 622 (2002), *Libretti v. United States*, 516 U.S. 29 (1995), *Kimmelman v. Morrison*, 477 U.S. 365 (1986), *Hill v. Lockhart*, 474 U.S. 52 (1985), *Strickland v. Washington*, 466 U.S. 668 (1984), *Henderson v. Morgan*, 426 U.S. 637 (1976), *McMann v. Richardson*, 397 U.S. 759 (1970), *Boykin v. Alabama*, 395 U.S. 238 (1969), and *McCarthy v. United States*, 394 U.S. 459 (1969). (Doc. No. 1, PageID# 8, 12.) He also argues that the post-conviction trial court and the TCCA's "finding[s] and ruling[s] resulted in a decision that as based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." (*Id.* at PageID# 8.) Finally, Reynolds states that he procedurally defaulted his claims based on trial counsel's (1) failure to call as a witness the lawyer who had represented him in child support issues and (2) failure to file a motion for the trial judge to recuse himself, but that his post-conviction

attorney's deficient performance constitutes cause to excuse that default and a hearing is needed to develop these claims. (Doc. No. 1, PageID# 12–14; Doc. No. 22, PageID# 4089–92.)

Respondent counters that the TCCA reasonably applied *Strickland v. Washington* to reject Reynolds's ineffective assistance claims and therefore its decision was not contrary to, or an unreasonable application of, clearly established law. (Doc. No. 12, PageID# 86.) Respondent also argues that the TCCA's rejection of Reynolds's claims "was not . . . based on an unreasonable determination of the facts in light of the evidence." (*Id.* at PageID# 82.) In response to Reynolds's suggestion that he procedurally defaulted some of his claims, Respondent states those "claims were fully exhausted before the [TCCA]." (*Id.* at PageID# 87.)

### 1. The TCCA's rejection of Reynolds's ineffective assistance claims was not contrary to clearly established law.

Before analyzing Reynolds's ineffective assistance claims, the TCCA laid out the following standard:

> Lastly, the Petitioner argues that he was denied effective assistance of counsel. The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[3] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post–Conviction Procedure Act. *See* Tenn.Code Ann. § 40–30–103; *Pylant,* 263 S.W.3d at 868.

> In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. *See Strickland,* 466 U.S. at 687; *Goad v. State,* 938 S.W.2d 363, 370 (Tenn.1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. *Goad,* 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. *Id.*

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.' " *Vaughn v. State,* 202 S.W.3d 106, 116 (Tenn.2006) (quoting *Strickland,* 466 U.S. at 688)). Our supreme court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Baxter,* 523 S.W.2d at 934–35 (quoting *Beasley v. United States,* 491 F.2d 687, 696 (6th Cir.1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State,* 185 S.W.3d 319, 326 (Tenn.2006) (citing *Strickland,* 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. Honeycutt,* 54 S.W.3d 762, 767 (Tenn.2001) (quoting *Strickland,* 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. *Rhoden,* 816 S.W.2d at 60. We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State,* 847 S.W.2d 521, 528 (Tenn.Crim.App.1992) (citing *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn.1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn,* 202 S.W.3d at 116 (citing *Strickland,* 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Pylant,* 263 S.W.3d at 869 (citing *State v. Burns,* 6 S.W.3d 453, 463 (Tenn.1999)). "A reasonable probability of being found guilty of a lesser charge ... satisfies the second prong of *Strickland.*" *Id* .

*Reynolds II*, 2013 WL 1857112, at *32–33.

The TCCA properly identified *Strickland v. Washington* as controlling Reynolds's ineffective assistance claims. In parts of his briefing, Reynolds acknowledges that *Strickland* provides the governing standard (Doc. No. 22, PageID# 4094–95), but his citation of numerous other Supreme Court cases to support his claim that the TCCA's decision was contrary to clearly established law muddies the issue. None of the other cases Reynolds cites is relevant to his claims of ineffective assistance. All but one of those cases involve the rights of defendants during plea bargaining, and none of Reynolds's claims references that aspect of his prosecution. *See Padilla*, 559 U.S. at 360 (explaining that, the issue before the Court was whether Padilla's counsel "had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country"); *Ruiz*, 536 U.S. at 625 (considering "whether the Fifth and Sixth Amendments require federal prosecutors, before entering into a binding plea agreement with a criminal defendant, to disclose 'impeachment information relating to any informants or other witnesses'"); *Libretti*, 516 U.S. at 32 (deciding whether "Federal Rule of Criminal Procedure 11(f) requires the District Court to determine whether a factual basis exists for a stipulated asset forfeiture embodied in a plea agreement, and whether the Federal Rule of Criminal Procedure 31(e) right to a special jury verdict on forfeiture can only be waived following specific advice from the District Court as to the existence and scope of this right and an express, written waiver"); *Hill*, 474 U.S. at 53 (considering whether public defender's failure to advise client, who pleaded guilty, "that as a second offender, he was required to serve one-half of his sentence before becoming eligible for parole," amounted to ineffective assistance); *Henderson*, 426 U.S. at 638 (confronting the question of "whether a defendant may enter a voluntary plea of guilty to a charge of second-degree murder without being informed that intent to cause the death of his victim was an element of the offense"); *McMann*, 397 U.S. at 761 (facing the issue of "whether and to what extent an

otherwise valid guilty plea may be impeached in collateral proceedings by assertions or proof that the plea was motivated by a prior coerced confession"); *Boykin*, 395 U.S. at 242 (analyzing whether the trial judge had erred by accepting "petitioner's guilty plea without an affirmative showing that it was intelligent and voluntary"); *McCarthy*, 394 U.S. at 460 (involving "the procedure that must be followed under Rule 11 of the Federal Rules of Criminal Procedure before a United States District Court may accept a guilty plea and the remedy for a failure to follow that procedure"); (Doc. No. 1, PageID# 9).

The remaining case that Reynolds cites arose from defense counsel's failure to "file a timely motion to suppress evidence allegedly obtained in violation of the Fourth Amendment." *Kimmelman*, 477 U.S. at 368; (Doc. No. 1, PageID# 12). Reynolds's petition contains no such claim. (Doc. No. 1, PageID# 9.) The TCCA's treatment of Reynolds's ineffective assistance claims was not contrary to clearly established law.

   **2.  The TCCA's rejection of Reynolds's ineffective assistance claims was not an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts.**

Because the TCCA's decision was not contrary to *Strickland*, relief is only available for Reynolds if the TCCA's application of that decision was "objectively unreasonable," or if it was based on an unreasonable determination of the facts in light of the evidence presented. *Coleman*, 566 U.S. at 651; 28 U.S.C. § 2254(d)(2). Neither basis for relief applies here.

   **a.  Trial counsel's failure to (1) adequately conduct any meaningful pre-trial investigation, (2) communicate with Reynolds in preparation for trial, (3) interview potential witnesses that would have been favorable to the defense, and (4) allow Reynolds to view video statements of witnesses despite Reynolds's requests**

Although Reynolds raised these claims in the post-conviction trial court, he did not do so on appeal. *Compare* (Doc. No. 14-1, PageID# 3760–61), *with* (Doc. No. 14-4, PageID# 3911–13).

Failure to advance a theory of ineffective assistance in a post-conviction appeal can be grounds for finding that claim procedurally defaulted. *See Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (rejecting petitioner's ineffective assistance of counsel claim based on trial counsel's failure to pursue sufficient investigation on the grounds that such a theory was not advanced when petitioner asserted ineffective assistance of counsel before the state court). However, because Respondent did not make that argument, the affirmative defense of procedural default will not be considered sua sponte. *Stojetz v. Ishee*, 389 F. Supp. 2d 858, 910 (S.D. Ohio 2005).

The post-conviction trial court was the last state court to issue a reasoned opinion on these theories of ineffective assistance, and its rejection of them was neither an unreasonable application of *Strickland*, nor based on an unreasonable determination of the facts. In dismissing Reynolds's claims regarding trial counsel's failure to conduct any meaningful pre-trial investigation and communicate with Reynolds in preparation for trial, the post-conviction trial court noted that it did not find Reynolds's "testimony at the evidentiary hearing credible," and that trial counsel, "Mr. Brandon[,] testified in length about the investigative steps he took and the pre-trial motions he filed in this case." (Doc. No. 14-1, PageID# 3773.) The record of the evidentiary hearing confirms the post-conviction trial court's characterization of trial counsel's testimony. He recalled visiting the Tennessee Bureau of Investigation and the sheriff's department to review evidence, driving from Ms. Barger's house to the victim's to get a sense of the distance that Reynolds would have had to travel to commit the murder, interviewing Ms. Barger, Mr. Pace, and "the folks around [the victim's] home," and visiting Reynolds at the jail "many, many, many times." (Doc. No. 14-2, PageID# 3812–14, 3839.) Trial counsel also remembered filing a "motion for discovery," a "motion to inspect items seized by the [Tennessee Bureau of Investigation] and by the sheriff's department," a "motion to inspect the crime scene," a motion concerning "the extent of questions

allowed of Detective Mayercik," a motion "regarding jury questions," and a "notice of alibi." (*Id.* at PageID # 3812, 3815, 3817.)

The post-conviction trial court's decision to credit trial counsel's testimony over that of Reynolds is a factual determination that is entitled to a presumption of correctness under AEDPA. 28 U.S.C. § 2254(e)(1). Other than the conclusory statements that "trial counsel failed to adequately conduct any meaningful pre-trial investigation," and "communicate with [Reynolds] in preparation for trial," Reynolds has offered nothing to rebut that presumption. (Doc. No. 1, PageID# 9.) Given the extensive evidence in the record of trial counsel's pre-trial preparation and interaction with Reynolds, the post-conviction trial court's refusal to find trial counsel's performance deficient under *Strickland* was not based on an unreasonable determination of the facts, nor was it objectively unreasonable.

Next, the post-conviction trial court's rejection of Reynolds's claim that trial counsel failed to interview potential witnesses was reasonable and supported by the record. The court stated that Reynolds did not "establish any witness whom Mr. Brandon failed to interview that would have been favorable to the defense." (Doc. No. 14-1, PageID# 3773.) "Moreover," the court continued, trial counsel "testified [that] he talked to any witness he was asked to interview or speak with." (*Id.*) In neither his petition for post-conviction relief, nor his testimony at the post-conviction evidentiary hearing, did Reynolds name a single witness who trial counsel had failed to interview. (*See* Doc. No. 14-1, PageID# 3760; Doc. No. 14-2, PageID# 3784–3804.) And, as already mentioned, trial counsel testified that he interviewed several people, including Ms. Barger, Mr. Pace, "the folks around [the victim's] home." (Doc. No. 14-2, PageID# 3812–14.) Trial counsel also testified that he interviewed Reynolds's son-like figure Tanner Long, his friend Donovan and Donovan's father, preachers in Texas and Nashville, and Brandon McKinney and Wendy

Protchett. (*Id.* at PageID# 3818, 3838.) When trial counsel was asked if he had "heard today or . . . ever hear[d] of any witness that [Reynolds] asked [counsel] to interview that [counsel] [had] not," trial counsel responded: "Anybody that I'm asked to talk to, I do it." (*Id.* at PageID# 3838–39.) With respect to this claim, the post-conviction trial court's decision not to find trial counsel's performance deficient under *Strickland* was reasonable and consistent with the record.

Finally, the post-conviction trial court's dismissal of Reynolds's claim that trial counsel "never allowed [Reynolds] to view video statements of witnesses that were available to him despite [Reynolds's request]" is entitled to deference under AEDPA. (Doc. No. 1, PageID# 9.) The court stated that, with respect to that claim, it did not find Reynolds's "testimony at the evidentiary hearing credible" and that "Mr. Brandon testified [that] he went through all of the discovery materials with [Reynolds]." (Doc. No. 14-1, PageID# 3774.) Reynolds testified that he had requested to view the videos of witness statements but that trial counsel had not allowed him to. (Doc. No. 14-2, PageID# 3797:2–9.) When Reynolds was asked why he thought his request to view those videos was denied he said: "I just believe that [trial counsel] might have thought they were irrelevant. I'm not real sure. He told me a few things about various statements that other people had made, but that was the extent of it." (*Id.* at PageID# 3797:12–15.) In contrast, as the post-conviction trial court stated, trial counsel testified that he and Reynolds "went through all of the discovery in [his] case." (Doc. No. 14-2, PageID# 3840.) Reynolds has not rebutted the presumption of correctness to which the post-conviction trial court's finding—that trial counsel did share the videos of witness statements with Reynolds—is entitled. 28 U.S.C. § 2254(e)(1). Therefore, the post-conviction trial court's rejection of this claim was neither an unreasonable application of *Strickland* nor in tension with the factual record.

### b. Trial counsel's failure (1) to prepare Reynolds for trial and (2) to allow Reynolds to view the video recording of his statement to police prior to his testimony at trial

The TCCA analyzed this claim as follows:

> The Petitioner first asserts that trial counsel failed to prepare the Petitioner adequately for trial and failed to give the Petitioner an opportunity to review his video statement. In its order denying relief, the post-conviction court accredited trial counsel's testimony regarding "the investigative steps he took and the pre-trial motions he filed in this case," trial counsel's assertion that "he met with the Petitioner on a regular basis at the jail and [that] his interaction with the Petitioner at those meetings was very good," and trial counsel's testimony that both he and assistant trial counsel prepared the Petitioner for his direct and cross-examination. Additionally, the court accredited trial counsel's testimony that he remembered the room in which he showed the Petitioner his video statement and that he provided all discovery to the Petitioner. Conversely, the post-conviction court expressly found the Petitioner lacking credibility regarding these allegations.
>
> The evidence does not preponderate against the post-conviction court's findings. Trial counsel testified regarding his extensive preparation for trial, including a mock direct and cross-examination with the Petitioner. He also specifically remembered the room in which he showed the Petitioner his video statement. Although the Petitioner's testimony conflicts with that of trial counsel, we defer to the post-conviction court's credibility findings in these matters. *See Momon,* 18 S.W.3d at 156. The Petitioner has failed to establish deficient performance on the part of trial counsel in this regard. Thus, we do not need to address the prejudice prong. *See Goad,* 938 S.W.2d at 370. Accordingly, the Petitioner is entitled to no relief on this basis

*Reynolds II*, 2013 WL 1857112, at *33.

Reynolds does not explain how the TCCA's treatment of these claims is deficient under AEDPA. In his petition, he provides verbatim the TCCA's analysis and then proclaims that, "[f]or the foregoing reasons, . . . the Tennessee appellate courts utilized a standard of review that was contrary to, or involved an unreasonable application of, clearly established federal law . . . and/or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." (Doc. No. 1, PageID# 12.) That conclusory statement is insufficient to establish entitlement to relief.

Further, the record is consistent with the TCCA's description of trial counsel's testimony. With respect to trial preparation, trial counsel testified as follows:

> Mr. Hogan and I prepared him for cross examination. There again that's the client's call as to whether they testify or not, but you prepare them coming into it whether they're planning on it or not planning on it. You prepare them coming into it because they could change their mind. Mr. Hogan and I would take on the role of General Whitesell. And one of us would play our side and one of us would play Bill. And then we would swap up and go with that a different way for the purpose of him getting direct examination and cross examination all at the same setting.

(Doc. No. 14-2, PageID# 3839.) Reynolds himself confirmed that he had received preparation to testify (*id.* at PageID# 3796:1–3), although he did not think that the preparation he received was adequate (*id.* at PageID# 3797:16-18).

> Regarding the video of Reynolds's statement to the police, trial counsel testified as follows:

> Mr. Reynolds said I didn't watch his video with him. I simply do not agree with that. Mr. Hogan went with me several times to the jail, but I went a lot to the jail by myself. And whenever I had videos to watch or when we were preparing Mr. Reynolds for trial for his testimony the jail would give us - - there's a little room right beside the telephone in booking. There's some telephones for folks to call out I guess to get a bondsman or whatever. But there's a small room right there. And Mr. Reynolds and Mr. Hogan and I, we would go in that room to prepare. Not always, but for the videos they would let us go in there. And they'd even let us shut the door which surprised me, but be that as it may they did because of the noise. And went through videos. Went through pictures with Mr. Reynolds. What he said before was right. Anytime I would come across something I would go out there to the jail and I would tell him about it and talk with him about it. I worked very hard.

(*Id.* at PageID# 3814.)

The TCCA's conclusion that trial counsel prepared Reynolds to testify and watched the video of his statement to the police with him is a finding of that is presumed to be correct under AEDPA. As just shown, that finding is supported by the record, and without any argument from Reynolds explaining why it is incorrect, it must receive this Court's deference. Given that finding, the TCCA's conclusion that trial counsel's performance was not deficient under *Strickland* was not objectively unreasonable.

### c. Trial counsel's failure to call, as a trial witness, the attorney who was representing Reynolds in certain child support issues

The TCCA rejected this claim as follows:

> Additionally, the Petitioner claims that trial counsel failed to call his custody counsel as a witness at trial. Looking first to the deficiency prong, the post-conviction court accredited trial counsel's testimony that such a decision ultimately rested with the Petitioner. At the post-conviction hearing, trial counsel testified that, at the time, he believed it best not to call custody counsel as a witness because, although she considered the Petitioner a "very nice man," she also would be asked about the number of times the Petitioner called the victim and the fact that he brought her discovery after the victim died without informing her of the victim's death. Trial counsel further explained that he has a rule in which he provides as much information as possible and then allows his clients to make the ultimate decisions. Accordingly, regarding the decision to call the Petitioner's custody attorney as a witness, "the Petitioner would have been the one to make the decision, not [trial counsel]." Therefore, we need not address the prejudice prong. *See Goad,* 938 S.W.2d at 370.

> Furthermore, the Petitioner never called his custody counsel to testify at the post-conviction hearing. The post-conviction court found that the Petitioner failed to "subpoena [his custody attorney] to testify at the evidentiary hearing, ... [to] establish how her testimony would have been favorable, nor did he present any actual proof regarding what [her] testimony would have entailed." This Court has made clear that a claim of ineffective assistance of counsel arising from the failure to call a witness must be supported by testimony from the witness at the post-conviction hearing. *See, e.g., Denton v. State,* 945 S.W.2d 793, 802–03 (Tenn.Crim.App.1996); *Wade v. State,* 914 S.W.2d 97, 102 (Tenn.Crim.App.1995); *Black v. State,* 794 S.W.2d 752, 757–58 (Tenn.Crim.App.1990); *see also Pylant,* 263 S.W.2d at 869. Without the alleged witness's testimony, there is no way for the post-conviction court (or this Court) to evaluate whether the absence of the testimony from trial had a prejudicial effect on the outcome. Accordingly, the Petitioner is entitled to no relief on this issue.

*Reynolds II*, 2013 WL 1857112, at *33–34.

The object of Reynolds's critique is not the TCCA's treatment of this claim; rather, it is the job that post-conviction counsel did presenting it: "Post Conviction counsel procedurally defaulted [Reynolds's] Ineffective Assistance of trial Counsel claims by . . . failing to 'subpoena [his custody attorney] to testify at the evidentiary hearing, . . . . [to] establish how her testimony would have been favorable, nor did he present any actual proof regarding what [her] testimony

would have entailed.'" (Doc. No. 1, PageID# 12.) Reynolds argues that post-conviction counsel's ineffective assistance is "cause" that can excuse the default of this claim and then requests a "hearing to develop the facts necessary to evaluate whether the absence of the testimony from trial had a prejudicial effect on the outcome." (Doc. No. 22, PageID# 4097.)

Reynolds's argument fails for two reasons. Post-conviction counsel's error only affected Reynolds's ability to show that he was prejudiced when his trial lawyer did not call his custody counsel to testify, but, as the TCCA's analysis above indicates, the TCCA had dismissed this claim before it reached the question of prejudice. *Reynolds II*, 2013 WL 1857112, at *33. The TCCA found that trial counsel's performance had not been deficient—the court credited counsel's testimony that Reynolds decided whether to call his custody lawyer. *Id.* But even if the TCCA had rejected this claim under the prejudice prong alone, post-conviction counsel's "shoddy" presentation of it would not amount to "procedural default," as Reynolds suggests. (Doc. No. 1, PageID# 13.) Reynolds has conflated poor presentation of his claim with a complete failure to present it, the latter being an event that might trigger the doctrine of procedural default. As Reynolds himself admits, "both state courts determined that Reynolds' trial counsel was constitutionally sufficient and disposed of Reynolds'[s] *Strickland* claim under the deficient performance prong. As such, this prong was adjudicated *on the merits* and the Court should review this determination through the lens of AEDPA deference." (Doc. No. 1, PageID# 8 (emphasis added).) A claim that has been adjudicated on the merits by the TCCA is, by definition, not procedurally defaulted. To the extent that Reynolds has tried to raise an ineffective assistance claim based on post-conviction counsel's performance, that effort fails. As Respondent notes, "[t]here is

no constitutional right to an attorney in state post-conviction proceedings."[13] (Doc. No. 12,

PageID# 87–88 (quoting *Coleman*, 501 U.S. at 752).)

> **d. Trial counsel's failure to file a motion for the trial judge to recuse himself despite counsel's awareness that the wife of the trial judge was a co-employee of members of the victim's family**

The TCCA analyzed this claim as follows:

> Finally, the Petitioner contends that trial counsel failed to file a motion to recuse the trial judge in this case. Turning first to the prejudice prong, the post-conviction court found that the Petitioner failed to present proof establishing that "the victim's brother and victim's husband work for Bob Park [ ]s Realty" and failed "to establish which Bob Park[ ]s Realty office these individuals work at, when they worked for this company, what job they perform, [or] what county they work in." The court also determined that the Petitioner failed to establish deficiency on the part of trial counsel in not filing the motion prior to trial.

> Once again, the evidence does not preponderate against the post-conviction court's findings. The Petitioner was unable to tell the post-conviction court at which office the victim's family members worked and whether it was the same office as where the court's wife worked and produced no other evidence addressing these points. Therefore, the Petitioner has failed to establish that "he was denied his right to a fair trial before an impartial tribunal." *Smith v. State,* 357 S.W.3d 322, 345

---

[13]     Reynolds's citation of *Martinez v. Ryan*, 569 U.S. 413 (2012) and *Trevino v. Thaler*, 569 U.S. 413 (2013), is inapt. (*See* Doc. No. 22, PageID# 4093.) In *Martinez*, the Supreme Court held that:

> when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

*Martinez*, 566 U.S. at 14. In *Trevino*, the Court held that the rule of *Martinez* applied in Texas, even though the law there did not "on its face *require* a defendant initially to raise an ineffective-assistance-of-trial-counsel claim in a state collateral review proceeding." *Trevino*, 569 U.S. at 417. As discussed above, no Tennessee procedural rule prevented Reynolds from presenting his ineffective assistance claim based on trial counsel's failure to call Reynolds's custody counsel as a trial witness; instead, post-conviction counsel raised the claim, and it was dismissed on the merits. *Martinez* and *Trevino* therefore do not apply.

(Tenn.2011). Although we need not address the deficiency prong, *see Goad,* 938 S.W.2d at 370, we note that trial counsel testified at the post-conviction hearing that he did not remember this issue arising until after the trial was completed. Accordingly, the Petitioner is entitled to no relief on his ineffective assistance of counsel claim.

*Reynolds II*, 2013 WL 1857112, at *34.

Again, Reynolds focuses his argument on post-conviction counsel's performance rather than the TCCA's ruling: "Post-conviction counsel failed to conduct a prompt investigation of the circumstances of the case and explore all avenues relevant to the merits of the case," leading to a procedural default of this theory of ineffective assistance. (Doc. No. 22, PageID# 4097.) The implication of that argument is that, had post-conviction counsel properly investigated the facts underlying this claim, Reynolds might have been able to show that the trial judge's wife did in fact work with members of the victim's family, and therefore, that the trial judge was biased against Reynolds. This argument fails for the same reasons discussed above. The TCCA ruled on the merits of this claim which prevented it from being procedurally defaulted. Because there is no constitutional right to post-conviction counsel, a claim based solely on post-conviction counsel's failure to "conduct a prompt investigation of the circumstances of the case and explore all avenues relevant to the merits of the case" cannot give rise to relief under AEDPA. (Doc. No. 1, PageID# 14.)

## VI.    Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Reynolds's petition (Doc. No. 1) be DENIED. Reynolds's motion to ascertain status (Doc. No. 29) is FOUND MOOT.

Any party has fourteen (14) days after being served with this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing those objections shall have fourteen (14) days after being served with them in which to file any response.

Fed. R. Civ. P. 72(b)(2). Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 28th day of September, 2018.

ALISTAIR E. NEWBERN
United States Magistrate Judge